## POPE ET AL. *v.* ILLINOIS

No. 85–1973.   Argued February 24, 1987—Decided May 4, 1987

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and POWELL, O'CONNOR, and SCALIA, JJ., joined, and in Parts I and II of which BLACKMUN, J., joined. SCALIA, J., filed a concurring opinion, *post*, p. 504. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, *post*, p. 505. BRENNAN, J., filed a dissenting opinion, *post*, p. 506. STEVENS, J., filed a dissenting opinion, in which MARSHALL, J., joined, in all but n. 11 of which BRENNAN, J., joined, and in Part I of which BLACKMUN, J., joined, *post*, p. 507.

*Glenn A. Stanko* argued the cause for petitioners. With him on the briefs was *J. Steven Beckett.*

*Sally Louise Dilgart,* Assistant Attorney General of Illinois, argued the cause for respondent. On the brief were *Neil F. Hartigan,* Attorney General, *Roma J. Stewart,* Solicitor General, and *Mark L. Rotert* and *Jack Donatelli,* Assistant Attorneys General.*

JUSTICE WHITE delivered the opinion of the Court.

In *Miller* v. *California,* 413 U. S. 15 (1973), the Court set out a tripartite test for judging whether material is obscene. The third prong of the *Miller* test requires the trier of fact to determine "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." *Id.,* at 24. The issue in this case is whether, in a prosecution for

---

*Briefs of *amici curiae* urging reversal were filed for the American Booksellers Association, Inc., et al. by *Michael A. Bamberger, R. Bruce Rich, Roger L. Funk,* and *Maxwell J. Lillienstein;* for the American Civil Liberties Union et al. by *Bruce J. Ennis, Jr., David W. Ogden, Harvey Grossman, Jane M. Whicher, Jack Novik,* and *David Goldstein;* and for Volunteer Lawyers for the Arts, Inc., by *Irwin Karp* and *I. Fred Koenigsberg.*

*Edward Cooper* and *James J. Clancy* filed a brief for the city of Santa Ana, California, as *amicus curiae.*

the sale of allegedly obscene materials, the jury may be instructed to apply community standards in deciding the value question.

## I

On July 21, 1983, Rockford, Illinois, police detectives purchased certain magazines from the two petitioners, each of whom was an attendant at an adult bookstore. Petitioners were subsequently charged separately with the offense of "obscenity" for the sale of these magazines. Each petitioner moved to dismiss the charges against him on the ground that the then-current version of the Illinois obscenity statute, Ill. Rev. Stat., ch. 38, ¶ 11–20 (1983), violated the First and Fourteenth Amendments to the United States Constitution. Both petitioners argued, among other things, that the statute was unconstitutional in failing to require that the value question be judged "solely on an objective basis as opposed to reference [sic] to contemporary community standards." App. 8, 22.[1] Both trial courts rejected this contention and instructed the respective juries to judge whether the material was obscene by determining how it would be viewed by ordinary adults in the whole State of Illinois.[2] Both petitioners

---

[1] As noted in petitioners' motions to dismiss, App. 7, 21, the statute under which petitioners were prosecuted had been construed to incorporate the third prong of the tripartite test set out in the plurality opinion in *Memoirs* v. *Massachusetts*, 383 U. S. 413 (1966), viz., material is obscene only if "utterly without redeeming social value." *Id.*, at 418. See *People* v. *Ridens*, 59 Ill. 2d 362, 321 N. E. 2d 264 (1974); *People* v. *Thomas*, 37 Ill. App. 3d 320, 346 N. E. 2d 190 (1976). In *Miller* v. *California*, 413 U. S. 15, 22 (1973), the Court held that this test is not constitutionally mandated because it imposes a burden of proof on the State that is "virtually impossible to discharge under our criminal standards of proof." Nonetheless, at the time petitioners were prosecuted Illinois still chose to retain the higher burden of proof on the value question, which it was of course free to do. For purposes of this case, it makes no difference that the value inquiry was under the *Memoirs* as opposed to the *Miller* test.

[2] The instructions stated that the obscenity determination was to be made under a statewide standard rather than by reference to the standard of any single city, town, or region within the State. App. 11, 25–26.

were found guilty, and both appealed to the Illinois Appellate Court, Second District. That court also rejected petitioners' contention that the issue of value must be determined on an objective basis and not by reference to contemporary community standards. 138 Ill. App. 3d 726, 486 N. E. 2d 350 (1985); 138 Ill. App. 3d 595, 486 N. E. 2d 345 (1985). The Illinois Supreme Court denied review, and we granted certiorari, 479 U. S. 812 (1986).

## II

There is no suggestion in our cases that the question of the value of an allegedly obscene work is to be determined by reference to community standards. Indeed, our cases are to the contrary. *Smith* v. *United States*, 431 U. S. 291 (1977), held that, in a federal prosecution for mailing obscene materials, the first and second prongs of the *Miller* test—appeal to prurient interest and patent offensiveness—are issues of fact for the jury to determine applying contemporary community standards. The Court then observed that, unlike prurient appeal and patent offensiveness, "[l]iterary, artistic, political, or scientific value . . . is not discussed in *Miller* in terms of contemporary community standards." *Id.*, at 301 (citing F. Schauer, The Law of Obscenity 123–124 (1976)). This comment was not meant to point out an oversight in the *Miller* opinion, but to call attention to and approve a deliberate choice.

In *Miller* itself, the Court was careful to point out that "[t]he First Amendment protects works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas these works represent." 413 U. S., at 34. Just as the ideas a work represents need not obtain majority approval to merit protection, neither, insofar as the First Amendment is concerned, does the value of the work vary from community to community based on the degree of local acceptance it has won. The proper inquiry is not whether an ordinary member of any given community

would find serious literary, artistic, political, or scientific value in allegedly obscene material, but whether a reasonable person would find such value in the material, taken as a whole.[3] The instruction at issue in this case was therefore unconstitutional.

## III

The question remains whether the convictions should be reversed outright or are subject to salvage if the erroneous instruction is found to be harmless error. Petitioners contend that the statute is invalid on its face and that the convictions must necessarily be reversed because, as we understand it, the State should not be allowed to preserve any conviction under a law that poses a threat to First Amendment values. But the statute under which petitioners were convicted is no longer on the books; it has been repealed and replaced by a statute that does not call for the application of community standards to the value question.[4] Facial invali-

---

[3] Of course, as noted above, the mere fact that only a minority of a population may believe a work has serious value does not mean the "reasonable person" standard would not be met.

The State contends that without an instruction to apply contemporary community standards the jury will be at a loss as to how to decide the value issue. Brief for Respondent 21. In an obscenity prosecution the trial court, in its discretion, could instruct the jury to decide the value question by considering whether a reasonable person would find serious literary, artistic, political, or scientific value in the work, taken as a whole. Such an instruction would be no more likely to confuse a jury than the "reasonable man" instructions that have been given for generations in other contexts, such as tort suits.

The State also suggests, in attempting to justify the use of a "community standards" instruction on the value question, that such an instruction is the functional equivalent of a "reasonable man" instruction. Id., at 16. The risk, however, is that under a "community standards" instruction a jury member could consider himself bound to follow prevailing local views on value without considering whether a reasonable person would arrive at a different conclusion.

[4] The new statute provides in relevant part:

"Any material or performance is obscene if: (1) the average person, applying contemporary adult community standards, would find that, taken as a whole, it appeals to the prurient interest; and (2) the average person,

dation of the repealed statute would not serve the purpose of preventing future prosecutions under a constitutionally defective standard. Cf., *e. g.*, *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, 467 U. S. 947, 964–968, and n. 13 (1984). And if we did facially invalidate the repealed statute and reverse petitioners' convictions, petitioners could still be retried under that statute, provided that the erroneous instruction was not repeated, because petitioners could not plausibly claim that the repealed statute failed to give them notice that the sale of obscene materials would be prosecuted. See *Dombrowski* v. *Pfister*, 380 U. S. 479, 491, n. 7 (1965); *United States* v. *Thirty-seven Photographs*, 402 U. S. 363, 375, n. 3 (1971). Under these circumstances, we see no reason to require a retrial if it can be said beyond a reasonable doubt that the jury's verdict in this case was not affected by the erroneous instruction.

The situation here is comparable to that in *Rose* v. *Clark*, 478 U. S. 570 (1986). In *Rose*, the jury in a murder trial was incorrectly instructed on the element of malice,[5] yet the Court held that a harmless-error inquiry was appropriate. The Court explained that in the absence of error that renders a trial fundamentally unfair, such as denial of the right to counsel or trial before a financially interested judge, a conviction should be affirmed "[w]here a reviewing court can find that the record developed at trial established guilt beyond a

---

applying contemporary adult community standards, would find that it depicts or describes, in a patently offensive way, ultimate sexual acts or sadomasochistic sexual acts, whether normal or perverted, actual or simulated, or masturbation, excretory functions or lewd exhibitions of the genitals; and (3) taken as a whole, it lacks serious literary, artistic, political or scientific value." Ill. Rev. Stat., ch. 38, ¶ 11–20(b) (1985) (effective Jan. 1, 1986).

[5] The jury in *Rose* was instructed that "[a]ll homicides are presumed to be malicious in the absence of evidence which would rebut the implied presumption." This instruction shifted the burden of proof on an element of the crime, in violation of *Sandstrom* v. *Montana*, 442 U. S. 510 (1979), and *Francis* v. *Franklin*, 471 U. S. 307 (1985).

reasonable doubt . . . ." *Id.*, at 579. The error in *Rose* did not entirely preclude the jury from considering the element of malice, *id.*, at 580, n. 8, and the fact that the jury could conceivably have had the impermissible presumption in mind when it considered the element of malice was not a reason to retry the defendant if the facts that the jury necessarily found established guilt beyond a reasonable doubt.[6] The Court said: "When a jury is instructed to presume malice from predicate facts, it still must find the existence of those facts beyond reasonable doubt. *Connecticut* v. *Johnson*, 460 U. S. 73, 96–97 (1983) (POWELL, J., dissenting). In many cases, the predicate facts conclusively establish intent, so that no rational jury could find that the defendant committed the relevant criminal act but did not *intend* to cause injury." *Id.*, at 580–581.

Similarly, in the present cases the jurors were not precluded from considering the question of value: they were informed that to convict they must find, among other things, that the magazines petitioners sold were utterly without redeeming social value. While it was error to instruct the juries to use a state community standard in considering the value question, if a reviewing court concludes that no rational juror, if properly instructed, could find value in the magazines, the convictions should stand.[7]

---

[6] We do not understand *Rose*, as JUSTICE STEVEN's dissent apparently does, to be based on the fiction that a reviewing court could say beyond all reasonable doubt that the jury *in fact* did not have the impermissible burden-shifting instruction in mind when it concluded that the defendant killed with malice. To say that the jury "would have found it unnecessary to rely on the presumption," *Connecticut* v. *Johnson*, 460 U. S. 73, 97, n. 5 (POWELL, J., dissenting), or that the impermissible instruction was "superfluous," *Rose*, 478 U. S., at 581, is not to say that the reviewing court can retrace the jury's deliberative processes but that the facts found by the jury were such that it is clear beyond a reasonable doubt that if the jury had never heard the impermissible instruction its verdict would have been the same.

[7] The problem with the instructions in both cases is that the jury could have been impermissibly aided or constrained in finding the relevant ele-

Although we plainly have the authority to decide whether, on the facts of a given case, a constitutional error was harmless under the standard of *Chapman* v. *California,* 386 U. S. 18 (1967), we do so sparingly. *Rose* v. *Clark, supra,* at 584. In this case the Illinois Appellate Court has not considered the harmless-error issue. We therefore vacate its judgment and remand so that it may do so.

*It is so ordered.*

JUSTICE SCALIA, concurring.

I join the Court's opinion with regard to harmless error because I think it implausible that a community standard embracing the entire State of Illinois would cause any jury to convict where a "reasonable person" standard would not. At least in these circumstances, if a reviewing court concludes that no rational juror, properly instructed, could find value in the magazines, the Constitution is not offended by letting the convictions stand.

I join the Court's opinion with regard to an "objective" or "reasonable person" test of "serious literary, artistic, political, or scientific value," *Miller* v. *California,* 413 U. S. 15, 24 (1973), because I think that the most faithful assessment of what *Miller* intended, and because we have not been asked to reconsider *Miller* in the present case. I must note, however, that in my view it is quite impossible to come to an objective assessment of (at least) literary or artistic value, there being many accomplished people who have found literature in Dada, and art in the replication of a soup can. Since

---

ment of the crime: in *Rose,* by the erroneous presumption; in this case, by possible reliance on unreasonable community views on the value question. By leaving open the possibility that petitioners' convictions can be preserved despite the instructional error, we do no more than we did in *Rose.* To the extent that cases prior to *Rose* may indicate that a conviction can never stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of proof, see, *e. g., Cabana* v. *Bullock,* 474 U. S. 376, 384 (1986), after *Rose,* they are no longer good authority.

ratiocination has little to do with esthetics, the fabled "reasonable man" is of little help in the inquiry, and would have to be replaced with, perhaps, the "man of tolerably good taste"—a description that betrays the lack of an ascertainable standard.   If evenhanded and accurate decisionmaking is not always impossible under such a regime, it is at least impossible in the cases that matter.   I think we would be better advised to adopt as a legal maxim what has long been the wisdom of mankind: *De gustibus non est disputandum.*   Just as there is no use arguing about taste, there is no use litigating about it.   For the law courts to decide "What is Beauty" is a novelty even by today's standards.

The approach proposed by Part II of JUSTICE STEVENS' dissent does not eliminate this difficulty, but arguably aggravates it.   It is a refined enough judgment to estimate whether a reasonable person *would* find literary or artistic value in a particular publication; it carries refinement to the point of meaninglessness to ask whether he *could* do so. Taste being, as I have said, unpredictable, the answer to the question must always be "yes"—so that there is little practical difference between that proposal and Part III of JUSTICE STEVENS' dissent, which asserts more forthrightly that "government may not constitutionally criminalize mere possession or sale of obscene literature, absent some connection to minors, or obtrusive display to unconsenting adults."   *Post,* at 513 (footnote omitted).

All of today's opinions, I suggest, display the need for reexamination of *Miller.*

JUSTICE BLACKMUN, concurring in part and dissenting in part.

I join Part I of JUSTICE STEVENS' dissenting opinion for I agree with him that "harmless error" analysis may not appropriately be applied to this case.   I join Parts I and II of JUSTICE WHITE's opinion for the Court (but not the Court's judgment remanding the case for harmless-error analysis),

however, because I believe the standard enunciated in those Parts of that opinion meets the other concerns voiced by the dissent. JUSTICE WHITE points out: "Just as the ideas a work represents need not obtain majority approval to merit protection, neither, insofar as the First Amendment is concerned, does the value of the work vary from community to community based on the degree of local acceptance it has won." *Ante*, at 500. JUSTICE WHITE further emphasizes: "Of course . . . the mere fact that only a minority of a population may believe a work has serious value does not mean the 'reasonable person' standard would not be met." *Ante*, at 501, n. 3. Thus, contrary to the dissent's characterization, I do not think that "[a] juror asked to create a 'reasonable person' in order to apply the standard that the Court announces today might well believe that the majority of the population who find no value in such a book are more reasonable than the minority who do find value." *Post*, at 512. Rather, the Court's opinion stands for the clear proposition that the First Amendment does not permit a majority to dictate to discrete segments of the population—be they composed of art critics, literary scholars, or scientists—the value that may be found in various pieces of work. That only a minority may find value in a work does not mean that a jury would not conclude that "a reasonable person would find such value in the material, taken as a whole." *Ante*, at 501. Reasonable people certainly may differ as to what constitutes literary or artistic merit. See *ante*, at 504 (SCALIA, J., concurring). As I believe JUSTICE SCALIA recognizes in his concurrence (although he may not applaud it), the Court's opinion today envisions that even a minority view among reasonable people that a work has value may protect that work from being judged "obscene."

JUSTICE BRENNAN, dissenting.

JUSTICE STEVENS persuasively demonstrates the unconstitutionality of criminalizing the possession or sale of "obscene" materials to consenting adults. I write separately

only to reiterate my view that *any* regulation of such material with respect to consenting adults suffers from the defect that "the concept of 'obscenity' cannot be defined with sufficient specificity and clarity to provide fair notice to persons who create and distribute sexually oriented materials, to prevent substantial erosion of protected speech as a byproduct of the attempt to suppress unprotected speech, and to avoid very costly institutional harms." *Paris Adult Theatre I* v. *Slaton*, 413 U. S. 49, 103 (1973) (BRENNAN, J., dissenting). I therefore join all but footnote 11 of JUSTICE STEVENS' dissent.

JUSTICE STEVENS, with whom JUSTICE MARSHALL joins, with whom JUSTICE BRENNAN joins except as to footnote 11, and with whom JUSTICE BLACKMUN joins as to Part I, dissenting.

The Court correctly holds that the juries that convicted petitioners were given erroneous instructions on one of the three essential elements of an obscenity conviction. Nevertheless, I disagree with its disposition of the case for three separate reasons: (1) the error in the instructions was not harmless; (2) the Court's attempt to clarify the constitutional definition of obscenity is not faithful to the First Amendment; and (3) I do not believe Illinois may criminalize the sale of magazines to consenting adults who enjoy the constitutional right to read and possess them.

I

The distribution of magazines is presumptively protected by the First Amendment. The Court has held, however, that the constitutional protection does not apply to obscene literature. If a state prosecutor can convince the trier of fact that the three components of the obscenity standard set forth in *Miller* v. *California*, 413 U. S. 15, 24 (1973), are satisfied, it may, in the Court's view, prohibit the sale of sexually explicit magazines. In a criminal prosecution, the pros-

ecutor must prove each of these three elements beyond a reasonable doubt. Thus, in these cases, in addition to the first two elements of the *Miller* standard, the juries were required to find, on the basis of proof beyond a reasonable doubt, that each of the magazines "lacks serious literary, artistic, political, or scientific value." *Ibid.*

The required finding is fundamentally different from a conclusion that a majority of the populace considers the magazines offensive or worthless.[1] As the Court correctly holds, the juries in these cases were not instructed to make the required finding; instead, they were asked to decide whether "ordinary adults in the whole State of Illinois" would view the magazines that petitioners sold as having value. App. 11, 25–26. Because of these erroneous instructions, the juries that found petitioners guilty of obscenity did not find one of the essential elements of that crime. This type of omission can never constitute harmless error.[2]

Just as the constitutional right to trial by jury prohibits a judge from directing a verdict for the prosecution, *United States* v. *Martin Linen Supply Co.*, 430 U. S. 564, 572–573 (1977), so too, "a jury's verdict cannot stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of proof." *Cabana* v. *Bullock*, 474 U. S. 376, 384 (1986). As JUSTICE WHITE has explained:

"It should hardly need saying that a judgment or conviction cannot be entered against a defendant no matter

[1] "The First Amendment protects works which, taken as a whole, have serious literary, artistic, political, or scientific value, regardless of whether the government or a majority of the people approve of the ideas these works represent." *Miller* v. *California*, 413 U. S., 15, 34 (1973). See *ante*, at 500.

[2] In Section II, *infra*, I explain my disagreement with the Court's formulation of the obscenity standard, and in Section III, *infra*, I elaborate on my reasons for believing that the Constitution does not tolerate criminal prosecution in cases such as this. For purposes of the harmless-error discussion, however, those disagreements are irrelevant.

how strong the evidence is against him, unless that evidence has been presented to a jury (or a judge, if a jury is waived) and unless the jury (or judge) finds from that evidence that the defendant's guilt has been proved beyond a reasonable doubt. It cannot be 'harmless error' wholly to deny a defendant a jury trial *on one or all elements of the offense* with which he is charged." *Henderson* v. *Morgan*, 426 U. S. 637, 650 (1976) (WHITE, J., concurring) (emphasis added).

Yet, this is exactly what happened in these cases. Because of the constitutionally erroneous instructions, petitioners were denied a jury determination on one of the critical elements of an obscenity prosecution.

An application of the harmless-error doctrine under these circumstances would not only violate petitioners' constitutional right to trial by jury, but would also pervert the notion of harmless error. When a court is asked to hold that an error that occurred did not interfere with the jury's ability to legitimately reach the verdict that it reached, harmless-error analysis may often be appropriate.[3] But this principle cannot apply unless the jury found all of the elements required to support a conviction. The harmless-error doctrine may enable a court to remove a taint from proceedings in order to *preserve* a jury's findings, but it cannot constitutionally *supplement* those findings. It is fundamental that an appellate court (and for that matter, a trial court) is not free to decide in a criminal case that, if asked, a jury *would* have found

---

[3] See, *e. g.*, *Rose* v. *Clark*, 478 U. S. 570 (1986) (instruction on permissive presumption may be found to have been "superfluous"); *Delaware* v. *Van Arsdall*, 475 U. S. 673 (1986) (failure to permit cross-examination on witness' bias); *Chapman* v. *California*, 386 U. S. 18 (1967) (improper comment on defendant's failure to testify); but see *Rose, supra,* at 587 (STEVENS, J., concurring) (harmless-error analysis may be inappropriate even when error does not implicate reliability and accuracy of factual findings). These cases are consistent with the theory that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Van Arsdall, supra,* at 681.

something that it did not find. We have consistently rejected the possibility of harmless error in these circumstances. See *Jackson* v. *Virginia*, 443 U. S. 307, 320, n. 14 (1979); *Carpenters* v. *United States*, 330 U. S. 395, 408–409 (1947); *Bollenbach* v. *United States*, 326 U. S. 607, 615 (1946); see also *Marks* v. *United States*, 430 U. S. 188, 196, n. 12 (1977).

The Court suggests that these cases "are no longer good authority" in light of the decision last term in *Rose* v. *Clark*, 478 U. S. 570 (1986). See *ante*, at 503–504, n. 7. I emphatically disagree. In *Rose* v. *Clark* the Court held that harmless-error analysis is applicable to instructions that informed the jury of the proper elements of the crime and the proper standard of proof, but impermissibly gave the jury the option of finding one of the elements through a presumption, in violation of *Sandstrom* v. *Montana*, 442 U. S. 510 (1979), and *Francis* v. *Franklin*, 471 U. S. 307 (1985). In holding harmless-error analysis applicable, the Court explained that because the presumption in question "'does not remove the issue of intent from the jury's consideration, *it is distinguishable from other instructional errors that prevent a jury from considering an issue.*'" 478 U. S., at 580, n. 8 (emphasis added), quoting *Connecticut* v. *Johnson*, 460 U. S. 73, 95, n. 3 (1983) (POWELL, J., dissenting). The Court reasoned that when the evidence is overwhelming on intent, the instruction allowing the jury to use a presumption can be deemed "simply superfluous," 478 U. S., at 581, for as JUSTICE POWELL had earlier stated, in some cases the evidence may be so "dispositive of intent that a reviewing court can say beyond a reasonable doubt that the jury would have found it unnecessary to rely on the presumption." *Connecticut* v. *Johnson*, 460 U. S., at 97, n. 5 (dissenting opinion). This case is, of course, far different. No court could ever determine that the instructions on the element were superfluous, since the error in the instructions went to the ultimate fact that the juries were required to find. *Rose* v.

*Clark* did not modify the precedents requiring that a jury find all of the elements of a crime under the proper standard, any more than it modified the Sixth Amendment's provision that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial by an impartial jury."

## II

Aside from its error in remanding convictions which must clearly be reversed, the Court announces an obscenity standard that fails to accomplish the goal that the Court ascribes to it. After stressing the need to avoid a mere majoritarian inquiry, the Court states:

> "The proper inquiry is not whether an ordinary member of any given community would find serious literary, artistic, political, or scientific value in allegedly obscene material, but whether a reasonable person would find such value in the material, taken as a whole." *Ante*, at 500–501.

The problem with this formulation is that it assumes that all reasonable persons would resolve the value inquiry in the same way. In fact, there are many cases in which *some* reasonable people would find that specific sexually oriented materials have serious artistic, political, literary, or scientific value, while *other* reasonable people would conclude that they have no such value. The Court's formulation does not tell the jury how to decide such cases.[4]

---

[4] Notwithstanding the Court's rejection of the community values test, the Court's standard would still, in effect, require a juror to apply community values, unless the juror were to find that an ordinary member of his or her community is not "a reasonable person." While this is, of course, not an impossible conclusion, it surely conflicts with the Court's admonition that the value of works does not "vary from community to community based on the degree of local acceptance it has won," and that whether a majority of the people find value in the material is immaterial. *Ante*, at 500, and n. 3. Indeed, as applied in the tort context, to which the Court analogizes, *ante*, at 501, n. 3, the reasonable man standard is extolled as enabling the "triers of fact . . . to look to a community standard." Re-

In my judgment, communicative material of this sort is entitled to the protection of the First Amendment if *some reasonable persons* could consider it as having serious literary artistic, political, or scientific value. Over 40 years ago, the Court recognized that

> "Under our system of government there is an accommodation for the widest varieties of tastes and ideas. What is good literature, what has educational value, what is refined public information, what is good art, varies with individuals as it does from one generation to another. . . . From the multitude of competing offerings the public will pick and choose. What seems to one to be trash may have for others fleeting or even enduring values." *Hannegan* v. *Esquire, Inc.*, 327 U. S. 146, 157–158 (1946).

The purpose of the third element of the *Miller* test is to ensure that the obscenity laws not be allowed to "'level' the available reading matter to the majority or lowest common denominator of the population. . . . It is obvious that neither *Ulysses* nor *Lady Chatterley's Lover* would have literary appeal to the majority of the population." F. Schauer, The Law of Obscenity 144 (1976). A juror asked to create "a reasonable person" in order to apply the standard that the Court announces today might well believe that the majority of the population who find no value in such a book are more reasonable than the minority who do find value.[5] First Amend-

---

statement (Second) of Torts § 283, Comment *c* (1965). Absent intolerable orthodoxy, First Amendment protection cannot be circumscribed by the attitudes of a "reasonable man," who has been described as an "'excellent'" character who "'stands like a monument in our Courts of Justice, vainly appealing to his fellow-citizens to order their lives after his own example.'" W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on the Law of Torts 174 (5th ed. 1984), quoting A. Herbert, Misleading Cases in the Common Law 12 (3d ed. 1928).

[5] The problems with the Court's formulation are accentuated when expert evidence is adduced about the value that the material has to a discrete segment of the population—be they art scholars, scientists, or literary crit-

ment protection surely must not be contingent on this type of subjective determination.

### III

There is an even more basic reason why I believe these convictions must be reversed. The difficulties inherent in the Court's "reasonable person" standard reaffirm my conviction that government may not constitutionally criminalize mere possession or sale of obscene literature, absent some connection to minors or obtrusive display to unconsenting adults.[6] During the recent years in which the Court has struggled with the proper definition of obscenity, six Members of the Court have expressed the opinion that the First Amendment, at the very least, precludes criminal prosecutions for sales such as those involved in this case.[7] Dissent-

---

ics. Certainly a jury could conclude that although those people reasonably find value in the material, the ordinary "reasonable person" would not.

[6] The definitional problems the Court confronts buttress the conclusion that:

"none of the available formulas, including the one announced today, can reduce the vagueness to a tolerable level while at the same time striking an acceptable balance between the protections of the First and Fourteenth Amendments on the one hand, and on the other, the asserted state interest in regulating the dissemination of certain sexually oriented materials." *Paris Adult Theatre I* v. *Slaton*, 413 U. S. 49, 84 (1973) (BRENNAN, J., dissenting).

[7] See *Roth* v. *United States*, 354 U. S. 476, 508 (1957) (Douglas and Black, JJ., dissenting); *Sewell* v. *Georgia*, 435 U. S. 982, 988 (1978) (Stewart, J., dissenting from denial of certiorari); *Paris Adult Theatre I, supra* (BRENNAN, Stewart, and MARSHALL, JJ., dissenting); *Smith* v. *United States*, 431 U. S. 291, 311 (1977) (STEVENS, J., dissenting). It has been recognized recently that the "the bulk of scholarly commentary is of the opinion that the Supreme Court's resolution of and basic approach to the First Amendment issues" involved in obscenity laws "is incorrect," in that it fails to adequately protect First Amendment values. See Attorney General's Comm'n on Pornography, Final Report 261 (July 1986).

On the state level, the Oregon Supreme Court recently held that its State Constitution gives people in Oregon the right to "write, print, read, say, show, or sell anything to a consenting adult even though that expression may be generally or universally considered 'obscene.'" *State* v. *Henry*, 302 Ore. 510, 525, 732 P. 2d 9, 18 (1987). At least five States do

ing in *Smith* v. *United States*, 431 U. S. 291 (1977), I explained my view:

"The question of offensiveness to community standards, whether national or local, is not one that the average juror can be expected to answer with evenhanded consistency. The average juror may well have one reaction to sexually oriented materials in a completely private setting and an entirely different reaction in a social context. Studies have shown that an opinion held by a large majority of a group concerning a neutral and objective subject has a significant impact in distorting the perceptions of group members who would normally take a different position. Since obscenity is by no means a neutral subject, and since the ascertainment of a community standard is such a subjective task, the expression of individual jurors' sentiments will inevitably influence the perceptions of other jurors, particularly those who would normally be in the minority. Moreover, because the record never discloses the obscenity standards which the jurors actually apply, their decisions in these cases are effectively unreviewable by an appellate court. In the final analysis, the guilt or innocence of a criminal defendant in an obscenity trial is determined primarily by individual jurors' subjective reactions to the materials in question rather than by the predictable application of rules of law.

"This conclusion is especially troubling because the same image—whether created by words, sounds, or pictures—may produce such a wide variety of reactions. As Mr. Justice Harlan noted: '[It is] often true that one

not have adult obscenity statutes, although they do criminalize certain materials harmful to minors. See Alaska Stat. Ann. § 11.61.125 (1983); Me. Rev. Stat. Ann., Tit. 17, § 2911 *et seq.* (1983); N. M. Stat. Ann. § 30–37–1 *et seq.* (1980 and Supp. 1986); S. D. Comp. Laws Ann. § 22–24–1 *et seq.* (1979); Vt. Stat. Ann., Tit. 13, § 2801 *et seq.* (1974 and Supp. 1987).

man's vulgarity is another's lyric. Indeed, we think it is largely because government officials [or jurors] cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual.' *Cohen* v. *California*, 403 U. S. 15, 25. In my judgment, the line between communications which 'offend' and those which do not is too blurred to identify criminal conduct. It is also too blurred to delimit the protections of the First Amendment." *Id.*, at 315–316 (footnotes omitted).

The Court has repeatedly recognized that the Constitution "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender* v. *Lawson*, 461 U. S. 352, 357 (1983).[8] These two requirements serve overlapping functions. Not only do vague statutes tend to give rise to selective and arbitrary prosecution, but selective and arbitrary prosecution often lessens the degree to which an actor is on notice that his or her conduct is illegal.

When petitioners Pope and Morrison accepted part-time employment as clerks in the bookstores, they could hardly have been expected to examine the stores' entire inventories, and even if they had, they would have had no way of knowing which, if any, of the magazines being sold were legally "obscene." Perhaps if the enterprise were being carried out in a

_____

[8] See also *Papachristou* v. *Jacksonville*, 405 U. S. 156, 162–163, 168–169 (1972); *Lanzetta* v. *New Jersey*, 306 U. S. 451, 453 (1939); *Connally* v. *General Construction Co.*, 269 U. S. 385, 391–393 (1926). We have been especially intolerant of vague statutes in the First Amendment area. See *Smith* v. *Goguen*, 415 U. S. 566, 573 (1974); *Grayned* v. *Rockford*, 408 U. S. 104, 108–109 (1972); *Interstate Circuit, Inc.* v. *Dallas*, 390 U. S. 676, 684–690 (1968); *Cramp* v. *Board of Public Instruction of Orange County*, 368 U. S. 278, 283–284 (1961); *Smith* v. *California*, 361 U. S. 147, 151 (1959); *Winters* v. *New York*, 333 U. S. 507, 515 (1948).

clandestine manner, it might be fair to impute to them knowledge that something illegal was going on. But these stores both had large signs indicating the nature of the enterprise, one claiming that the store had "The Largest Selection of Adult Merchandise in Northern Illinois." See People's Exhibit No. 3, *People* v. *Morrison*, No. 84–cm–4114 (17th Jud. Cir. Ill. 1984).[9] The Illinois Appellate Court found that Pope had the necessary scienter because it was "difficult to believe that [he] would not be fully apprised of the type and character of the three magazines simply by looking at them." App. to Pet. for Cert. 19. It is obvious that Pope knew that the magazines were "pornographic," but that does not mean he knew, or should have known, that they were legally "obscene" under the Illinois statute and our precedents.[10] It would have been quite reasonable for him to conclude that if sale of the magazines were indeed against the law, then the police would never allow the store to remain in operation, much less publicly advertise its goods.[11] Nor

---

[9] In both trials, the State used the fact that the stores were open only to those over 18 years of age as proof that respondents knew the materials were obscene. See Tr. in *People* v. *Pope*, No. 83–cm–4116, pp. 317–318 (17th Jud. Cir. Ill. 1984); Tr. in *People* v. *Morrison*, No. 84–cm–4114, p. 303 (17th Jud. Cir. Ill. 1984). As I explained in *Splawn* v. *California*, 431 U. S. 595 (1977):

"Signs which identify the 'adult' character of a motion picture theatre or a bookstore convey the message that sexually provocative entertainment is to be found within . . . . Such signs, however, also provide a warning to those who find erotic materials offensive that they should shop elsewhere for other kinds of books, magazines, or entertainment. Under any sensible regulatory scheme, truthful description of subject matter that is pleasing to some and offensive to others ought to be encouraged, not punished." *Id.*, at 604 (dissenting opinion).

[10] "The statements did make it clear that the films were 'sexually provocative,' but that is hardly a confession that they were obscene." *Id.*, at 603.

[11] The insurmountable vagueness problems involved in criminalization are not, in my view, implicated with respect to civil regulation of sexually explicit material, an area in which the States retain substantial leeway. See *Smith* v. *United States*, 431 U. S., at 317–321 (STEVENS, J., dissent-

would an examination of the statute have given him much guidance.

Under ordinary circumstances, ignorance of the law is no excuse for committing a crime. But that principle presupposes a penal statute that adequately puts citizens on notice of what is illegal. The Constitution cannot tolerate schemes that criminalize categories of speech that the Court has conceded to be so vague and uncertain that they cannot "be defined legislatively." *Smith* v. *United States*, 431 U. S., at 303. If a legislature cannot define the crime, Richard Pope and Michael Morrison should not be expected to. Criminal prosecution under these circumstances "may be as much of a trap for the innocent as the ancient laws of Caligula." *United States* v. *Cardiff*, 344 U. S. 174, 176 (1952).

Concern with the vagueness inherent in criminal obscenity statutes is not the only constitutional objection to the criminalization of the sale of sexually explicit material (not involving children) to consenting adults. In *Stanley* v. *Georgia*, 394 U. S. 557 (1969), the Court held that Georgia could not criminalize the mere possession of obscene matter. The decision was grounded upon a recognition that "[o]ur whole constitutional heritage rebels at the thought of giving government the power to control men's minds." *Id.*, at 565. The only justification we could find for the law there was

---

ing); see generally *Winters, supra,* at 515 ("The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement"). Moreover, as long as it does not deny "access to the market," and allows "the viewing public" to "satisfy its appetite for sexually explicit fare," I believe that the State may regulate the sale and exhibition of even nonobscene material. See *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50 (1976); *Schad* v. *Mount Ephraim,* 452 U. S. 61, 79 (1981) (STEVENS, J., concurring). As for prohibiting sale or exhibition of sexually explicit material to minors or material containing depiction of minors, it has long been established that the State may go beyond the constitutional definition of obscenity. See *New York* v. *Ferber,* 458 U. S. 747 (1982); *Ginsberg* v. *New York,* 390 U. S. 629 (1968); see also *Ferber, supra,* at 777 (STEVENS, J., concurring).

Georgia's desire to "protect the individual's mind from the effects of obscenity," *ibid.*, and we concluded that such a desire to "control the moral content of a person's thoughts . . . is wholly inconsistent with the philosophy of the First Amendment." *Id.*, at 565–566.

The Court has adopted a restrictive reading of *Stanley*, opining that it has no implications to the criminalization of the sale or distribution of obscenity. See *United States* v. *Reidel*, 402 U. S. 351 (1971); *United States* v. *12 200-Ft. Reels of Film*, 413 U. S. 123 (1973). But such a crabbed approach offends the overarching First Amendment principles discussed in *Stanley*, almost as much as it insults the citizenry by declaring its right to read and possess material which it may not legally obtain.[12] In *Stanley*, the Court recognized that there are legitimate reasons for the State to regulate obscenity: protecting children and protecting the sensibilities of unwilling viewers. 394 U. S., at 507. But surely a broad criminal prohibition on all sale of obscene material cannot survive simply because the State may constitutionally restrict public display or prohibit sale of the material to minors.

As was the case in *Smith*, "I do not know whether the ugly pictures in this record have any beneficial value." 431 U. S., at 319 (STEVENS, J., dissenting). I do know though:

> "The fact that there is a large demand for comparable materials indicates that they do provide amusement or information, or at least satisfy the curiosity of interested persons. Moreover, there are serious well-intentioned

---

[12] "After all, if a person has the right to receive information without regard to its social worth—that is, without regard to its obscenity—then it would seem to follow that a State could not constitutionally punish one who undertakes to provide that information to a *willing, adult recipient.*" *Paris Adult Theatre I*, 413 U. S., at 86, n. 9 (BRENNAN, J., dissenting); see also *United States* v. *Reidel*, 402 U. S. 351, 360 (1971) (MARSHALL, J., dissenting); *United States* v. *12 200-Ft. Reels of Film*, 413 U. S. 123, 137 (1973) (Douglas, J., dissenting).

people who are persuaded that they serve a worthwhile purpose. Others believe they arouse passions that lead to the commission of crimes; if that be true, surely there is a mountain of material just within the protected zone that is equally capable of motivating comparable conduct. Moreover, the baneful effects of these materials are disturbingly reminiscent of arguments formerly made about what are now valued as works of art. In the end, I believe we must rely on the capacity of the free marketplace of ideas to distinguish that which is useful or beautiful from that which is ugly or worthless." *Id.*, at 320–321 (footnotes omitted).

I respectfully dissent.