**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William DEE; Robert Lentz; Carl
Gepp, Defendants–Appellants.**

**No. 89–5606.**

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 8, 1990.

Decided Sept. 4, 1990.

---

Michael A. Brown, Washington, D.C., Richard Melvin Karceski, White & Karceski, Baltimore, Md., argued (George A. Breschi, Dinenna, Mann & Breschi, Towson, Md., William A. Hahn, Jr., Durkee, Thomas & Hahn, Baltimore, Md., on brief), for defendants-appellants.

Jane F. Barrett, Asst. U.S. Atty., Baltimore, Md., argued (Breckinridge L. Willcox, U.S. Atty., Veronica M. Clarke, Asst. U.S. Atty., Baltimore, Md., on brief), for plaintiff-appellee.

Before SPROUSE and CHAPMAN, Circuit Judges, and WARD, Senior District Judge for the Middle District of North Carolina, sitting by designation.

SPROUSE, Circuit Judge:

William Dee, Robert Lentz, and Carl Gepp (hereafter collectively "defendants") appeal the judgment of the district court entered after a jury trial finding them guilty of multiple violations of the criminal provisions of the Resource Conservation and Recovery Act ("RCRA" or "the Act"), 42 U.S.C. §§ 6901 *et seq.*[1] We affirm.

## I

RCRA provides a comprehensive scheme for regulating storage, treatment and disposal of hazardous waste, requiring that it be managed to prevent leakage, spillage, hazardous chemical reactions, and migration of toxins into the soil, water, or air.

In addition to administrative provisions, the Act creates criminal liability for persons who knowingly handle hazardous waste without a RCRA permit. 42 U.S.C. § 6928(d).[2]

The defendant engineers were civilian employees of the United States Army assigned to the Chemical Research, Development, and Engineering Center at Aberdeen Proving Ground in Maryland. All the defendants were involved in development of chemical warfare systems. Gepp, a chemical engineer, was responsible for operations at and maintenance of the Pilot Plant;[3] Dee and Lentz were Gepp's superiors. Counts One through Three of the superseding indictment charged the defendants with violating the Act by illegally storing, treating and disposing of hazardous wastes at the Pilot Plant. Count Four focused on violations alleged to have occurred at the "Old Pilot Plant",[4] a separate building complex that was closed in 1978.[5]

Aberdeen Proving Ground acquired an umbrella RCRA permit for management of hazardous waste materials at the Proving Ground. Under the permit, three separate areas at Aberdeen were designated for storage of hazardous wastes; however, the permit did not allow storage, treatment, or disposal of hazardous wastes at the Pilot Plant or the Old Pilot Plant. Aberdeen in 1982 promulgated a regulation, APG 200-2, that established "policies and procedures for management and disposal of solid and hazardous waste materials at Aberdeen Proving Ground" and mandated compliance with all federal, state, interstate, and local regulations, specifically referencing both the RCRA statute and RCRA regulations.

---

1. The district court suspended each defendant's sentence and placed each on probation for three years with a condition of 1,000 hours of community service work.

2. Paraphrased, the portion pertinent to this case reads: "Any person who knowingly treats, stores, or disposes of any hazardous waste identified or listed under this subchapter without a RCRA permit shall, upon conviction, be subject to fine and/or imprisonment." 42 U.S.C. § 6928(d)(2)(A).

3. The Pilot Plant complex included a four-story laboratory building, an administrative building, and storage sheds.

4. The Old Pilot Plant included a laboratory building, an office building, scrubbing towers and a storage area.

5. A fifth count charged defendants with violation of the Clean Water Act. 33 U.S.C. §§ 1251 *et seq.* The jury could not reach a verdict with respect to this count.

APG 200–2 directed all tenant organizations, such as the Center, to report any waste material "suspected to be toxic, carcinogenic, caustic, ignitable, or reactive" by filling out a form known as a "hard card." Upon receipt of the hard card, designated Aberdeen organizations were responsible for transporting hazardous wastes to the permitted [6] storage areas. APG 200–2 was specific and thorough, listing various individual chemicals and classes of chemicals that were likely to be hazardous, and reiterating that hazardous wastes were to be managed in accordance with all applicable laws.

In 1982, the Center issued a standard operating procedure, which in 1984 was reissued as a regulation known as CRDCR 710–1. It required identification of all RCRA wastes and directed that they be handled in accordance with the turn-in procedures of APG 200–2. Waste chemicals were defined as "those substances which have deteriorated to the point where they are no longer usable, are contaminated, or cannot be stored safely."

As heads of their respective departments, defendants were responsible for ensuring that the provisions of APG 200–2, CRDCR 710–1, and RCRA were fulfilled within their departments, and that their subordinates were aware of and in compliance with those regulations. Defendants admitted knowledge of APG 200–2, CRDCR 710–1, and RCRA.

## II

■ The defendants first contend that they are immune from the criminal provisions of RCRA because of their status as federal employees working at a federal facility. Because 42 U.S.C. § 6928(d) defines those liable as "any person who" knowingly violates the Act, and because neither the United States nor an agency of the United States is defined as a person, defendants maintain they cannot be "persons" in the sense contemplated by § 6928(d). They assert that by reason of their employment by the federal government they are entitled to its sovereign immunity, meaning they are immune from this criminal prosecution.

There is simply no merit to this suggestion. The Act defines "person" as

an individual, trust, firm, joint stock company, corporation (including a government corporation), partnership, association, State, municipality, commission, political subdivision of a State, or any interstate body.

42 U.S.C. § 6903(15). The definition begins with an inclusion of "an individual" as a person. The defendants, of course, were indicted, tried, and convicted as individuals, not as agents of the government. Suffice it to say that sovereign immunity does not attach to individual government employees so as to immunize them from prosecution for their criminal acts. *O'Shea v. Littleton*, 414 U.S. 488, 503, 94 S.Ct. 669, 679, 38 L.Ed.2d 674 (1974); *cf. Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978) ("all individuals, whatever their position in government, are subject to federal law"). Even where certain federal officers enjoy a degree of immunity for a particular sphere of official actions, there is no general immunity from criminal prosecution for actions taken while serving their office. *United States v. Hastings*, 681 F.2d 706, 710–12 (11th Cir.1982) ("A judge no less than any other man is subject to the processes of the criminal law"), *cert. denied*, 459 U.S. 1203, 103 S.Ct. 1188, 75 L.Ed.2d 434 (1983); *United States v. Diggs*, 613 F.2d 988, 1001 (D.C.Cir.1979) ("Article I, § 5 does not immunize a member of Congress from the operations of the criminal laws"), *cert. denied*, 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980). *See generally United States v. Isaacs*, 493 F.2d 1124, 1142–44 (7th Cir.) ("Criminal conduct is not part of the necessary functions performed by public officials"), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974).[7]

---

**6.** In regulatory parlance and as used in this opinion, "permitted" means an activity for which a valid *permit* has been issued. Conversely, "unpermitted" means the activity is not authorized by the facility's permit, or that the facility does not have a permit.

**7.** Because defendants were prosecuted as individuals, their argument as to the scope of Con-

## III

Defendants next contend that they did not "knowingly" commit the crimes proscribed by RCRA. *See* 42 U.S.C. § 6928(d). They claim that there was insufficient evidence to show that they knew violation of RCRA was a crime; also, that they were unaware that the chemicals they managed were hazardous wastes.

The Supreme Court has repeatedly rejected similar arguments in cases involving regulation of dangerous materials, applying the familiar principle that "ignorance of the law is no defense." *United States v. International Minerals & Chem. Corp.,* 402 U.S. 558, 563, 91 S.Ct. 1697, 1701, 29 L.Ed.2d 178 (1971); *United States v. Freed,* 401 U.S. 601, 607–10, 91 S.Ct. 1112, 1117–19, 28, L.Ed.2d 356 (1971); *United States v. Dotterweich,* 320 U.S. 277, 280–81, 64 S.Ct. 134, 136–37, 88 L.Ed. 48 (1943); *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922). We agree with the Eleventh Circuit that this time-honored rule applies to prosecutions under RCRA. *United States v. Hayes Int'l Corp.,* 786 F.2d 1499, 1502–03 (11th Cir. 1986); *see also United States v. Hoflin,* 880 F.2d 1033, 1036–39 (9th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1143, 107 L.Ed.2d 1047 (1990); *cf. United States v. Johnson & Towers, Inc.,* 741 F.2d 662, 669 (1984), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1171, 84 L.Ed.2d 321 (1985). "[W]here, as here ..., dangerous or deleterious devices or products or obnoxious waste materials are involved, the probability of regulation is so great that anyone who is aware that he is in possession of them or dealing with them must be presumed to be aware of the regulation." *International Minerals,* 402 U.S. at 565, 91 S.Ct. at 1701.

Therefore, the government did not need to prove defendants knew violation of RCRA was a crime, nor that regulations existed listing and identifying the chemical wastes as RCRA hazardous wastes. However, we agree with defendants that the knowledge element of § 6928(d) does extend to knowledge of the general hazardous character of the wastes. Among its jury instructions, the district court included one that advised:

> The government must prove beyond a reasonable doubt that each defendant knew that the substances involved were chemicals. However, the government need not establish that the defendants knew that these chemicals were listed or identified by law as hazardous waste....

While these statements are correct, it was error to instruct the jury that defendants had to know the substances involved were chemicals, without indicating that they also had to know the chemicals were hazardous. *See Hoflin,* 880 F.2d at 1039; *Johnson & Towers,* 741 F.2d at 668; *compare United States v. Greer,* 850 F.2d 1447, 1450 (11th Cir.1988) (jury instructed that defendant had to know the chemical waste had potential to harm others or the environment). However, we think the error was harmless. The record reflects overwhelming evidence that defendants were aware they were

gress's waiver of immunity under 42 U.S.C. § 6961 is inapposite. The same may be said of their reliance on *California v. Walters,* 751 F.2d 977 (9th Cir.1984), which involved an attempt by the City of Los Angeles to prosecute a federal agency and its administrator under California hazardous waste law. The Ninth Circuit held that, although 42 U.S.C. § 6961 directs federal agencies to comply with state hazardous waste laws, Congress did not intend to waive the United States' sovereign immunity to criminal sanctions.

*Walters* does not apply here for two reasons. First, unlike the case *sub judice, Walters* involved an action against a federal agency and its administrator in his official capacity. The *Walters* court expressly warned: "Our decision is compelled by the parties' agreement that the action is essentially one against the United States. Our holding in this case does not necessarily apply in all cases to prosecutions against federal officers or federal agencies." *Id.* at 979.

Second, *Walters* involved an attempt by a state to enforce state law against a federal agency and its officer. In certain circumstances, federal officers may avoid criminal prosecution by a state when the alleged crime arose from performance of federal duties. *Cunningham v. Neagle,* 135 U.S. 1, 75–76, 10 S.Ct. 658, 672, 34 L.Ed. 55 (1890); *Morgan v. California,* 743 F.2d 728, 731 (9th Cir.1984). The supremacy clause concerns which give rise to *Neagle*-type immunity are not implicated in this case, which involves prosecution for federal crimes by the federal government.

dealing with hazardous chemicals. *See Pope v. Illinois*, 481 U.S. 497, 501–03, 107 S.Ct. 1918, 1921–22, 95 L.Ed.2d 439 (1987); *Rose v. Clark*, 478 U.S. 570, 576–79, 106 S.Ct. 3101, 3105–106, 92 L.Ed.2d 460 (1986) (conviction should stand if the reviewing court can confidently say that no rational juror, if properly instructed, could have found for defendant).[8] Contrary to defendants' assertions, the evidence also clearly established that the materials they handled were "wastes" as that term is used in the statute.[9]

## IV

In addition to the preceding general challenges to their convictions, defendants raise issues specific to each count.

*Count One* charged defendants with unpermitted storage and disposal of a hazardous waste—dimethyl polysulfide—at the Pilot Plant from June 1983 to August 1984. Gepp and Lentz were found guilty of this count.

Dimethyl polysulfide is a chemical the Center had considered as a component for a binary chemical weapon.[10] During the 1970s, the Center produced dimethyl polysulfide at the Pilot Plant and also purchased some from chemical companies. In 1980, 200 canisters of dimethyl polysulfide were brought to the Pilot Plant from Fort Sill, Oklahoma, because they were leaking. All the dimethyl polysulfide was stored on the fourth floor of the Pilot Plant. Included were batches that had tested to be "bad" or "off-spec."

By 1981, the chemical weapon program which would have used the dimethyl polysulfide was cancelled. No more dimethyl polysulfide was produced, and no projects which would use dimethyl polysulfide were

planned. In May 1983, a safety inspector warned Lentz and Gepp that the roof of the Pilot Plant might collapse and that they should move the dimethyl polysulfide, but no action was taken. Four months later, a corner of the Pilot Plant did collapse, crushing several drums so that dimethyl polysulfide spilled and drained into the floor drains.

For the next several months, employees complained frequently to Lentz and Gepp about noxious odors from the dimethyl polysulfide, but not until the spring of 1984 did Gepp direct employees to move the containers of dimethyl polysulfide outside and to fill out hard cards on them. Gepp did not turn in the hard cards to the proper Aberdeen office until August 1984.

■ Defendants contend that dimethyl polysulfide is not a hazardous waste. It is not a listed hazardous waste,[11] but the government's theory at trial was that the dimethyl polysulfide handled by defendants came within the definition of a "characteristic" hazardous waste, because its "flash point" was less than 140° F.[12] Defendants argue that there was insufficient evidence to prove that dimethyl polysulfide had a flash point of less than 140° F, because a defense witness testified that he had conducted tests on dimethyl polysulfide which indicated flash points of 154° to 163° F. Cross-examination of the witness, however, reflected irregularities in his testing procedures. Additionally, the government introduced the following evidence: a Material Safety Data Sheet supplied by a manufacturer of dimethyl polysulfide indicating a flash point of 104° F; testimony by the person who had transported the dimethyl polysulfide from Fort Sill that he had seen a Material Safety Data Sheet listing the

---

**8.** We find no merit to the other contentions raised by the defendants in connection with the district court's instructions. As a whole, the instructions "fairly and adequately state[d] the pertinent legal principles involved." *See Hogg's Oyster Co. v. United States*, 676 F.2d 1015, 1019 (4th Cir.1982).

**9.** Defendants' self-serving argument that materials were not wastes until they declared them wastes is without merit. Furthermore, the evidence demonstrated that defendants considered

some if not all of the chemicals listed under each count to be wastes because they ordered their disposal.

**10.** Binary weapons make use of two chemicals, neither of which is lethal by itself, but which combine to form a lethal agent.

**11.** *See* 40 C.F.R. Part 261, Subpart D.

**12.** *See* 40 C.F.R. § 261.21.

flash point as 124° F; and the "hard card" which Gepp filled out on the dimethyl polysulfide listing the flash point as being between 61° and 100° F. In our view this evidence easily supports the jury verdict which implicitly found that dimethyl polysulfide was a characteristic hazardous waste. *Cf. Greer*, 850 F.2d at 1452 (evidence sufficient to support jury's conclusion that waste material was 1,1,1 trichloromethane).

Defendants also contend the dimethyl polysulfide was not a "waste" because it was still usable, *i.e.*, that it was not prudent to discard it because it conceivably could be of value to the weapons program at some time in the future. This argument is controverted by the fact that the defendants disposed of the dimethyl polysulfide in 1984.[13]

*Count Two* charged defendants with unpermitted storage and disposal of hazardous wastes at the Pilot Plant compound from June 1983 to April 1986. Only Gepp was convicted of the violations alleged in this count.

The United States Coast Guard had developed a program called the Chemical Hazard Response Information System (CHRIS) project. As part of the project, the Coast Guard contracted with the Center to study various hazardous chemicals in order to develop a manual for effectively responding to spills of those chemicals. At Gepp's direction, many excess and leftover CHRIS chemicals were placed in a shed in the Pilot Plant complex. Others were stored at various locations about the Pilot Plant.

On a number of occasions from 1980 to 1986, Gepp was informed by employees and safety inspectors that there were problems with the stored CHRIS chemicals, including corrosion and breakage of containers, leaks and spills, generation of fumes, and proximity of incompatible chemicals. Gepp either made no response to these warnings or merely told staff to clean it up as best they could. Finally, in 1986, the commander of the Center ordered operations at the Pilot Plant halted and the complex cleaned up. Hundreds of different chemicals were removed and taken to the Aberdeen hazardous waste storage facility. Other chemicals had to be destroyed by detonation because they were too unstable to be transported.

■ Gepp concedes that the chemicals were hazardous and that there was no use for them, but he asserts there was "little evidence" that he directed the storage or disposal operations. The government's evidence, however, shows that Gepp was in charge of operations at the Pilot Plant and that Gepp originally ordered the placement of leftover CHRIS chemicals in the storage shed. Gepp repeatedly ignored warnings about the hazardous condition of the CHRIS chemicals and other chemicals that were improperly stored about the Pilot Plant. He undertook no actions to comply with RCRA in the storage and disposal of the chemicals prior to the 1986 cleanup.

Defendants assert there was insufficient evidence that management of the CHRIS chemicals was an environmental crime, because " 'Sloppy' storage procedures is [sic] not a crime." They are simply wrong. Negligent and inept storage of hazardous wastes is one of the evils RCRA was designed to prevent, and § 6928(d) makes such egregious conduct a crime.

*Count Three* charged defendants with unpermitted treatment and disposal of hazardous wastes at the Pilot Plant from June 1983 to March 1986.[14] Lentz and Gepp were found guilty on this count.

Several sumps which collected materials from laboratories were located in the Pilot Plant. Periodically, the contents of the sumps were pumped to "neutralization

---

**13.** It is perhaps worth noting that RCRA does not require disposal of hazardous wastes. Prudent retention of a waste in the hope it will someday be a treasure is permissible if it is stored in accordance with a RCRA permit. *See* 40 C.F.R. § 261.2(e)(2)(iii).

**14.** Count Two involved storage and disposal of leftover CHRIS chemicals at the Pilot Plant. Count Three involved separate treatment and disposal of other chemicals at the Pilot Plant.

tanks."[15] Between June 1983 and March 1986, numerous hazardous waste chemicals were dumped into the sumps at Gepp's direction. Additionally, at the direction of Gepp and Lentz, drums containing hazardous waste chemicals were cleaned by dumping the chemical onto the ground at the Pilot Plant, then rinsing the drum with acetone, alcohol or water, and dumping the rinsate onto the ground. Also, a Pilot Plant incinerator which was not permitted for incineration of hazardous waste was used to dispose of methyl chloride, which is a listed hazardous waste.

Lentz and Gepp contend that any disposal of hazardous wastes into the Pilot Plant sumps was exempt from the requirements of RCRA. The definition of solid waste excludes mixtures of domestic sewage and other wastes which go to a "publicly-owned treatment works." 40 C.F.R. § 261.4(a). The Pilot Plant sumps fed into neutralization tanks that were connected to a sewer system that fed into a sewage treatment plant. Defendants therefore claim disposal into the Pilot Plant sumps was exempt from regulation under RCRA.

■ Defendants have not pointed to evidence in the record establishing the factors of a § 261.4(a) exclusion.[16] However, we need not decide the issue, because defendants do not dispute that the government proved other unpermitted treatment and disposal of hazardous wastes at the Pilot Plant—dumping of wastes on the ground and incineration of methyl chloride.[17]

*Count Four* charged defendants with unpermitted storage and disposal of hazardous wastes at the Old Pilot Plant from June 1983 to August 1986. Lentz and Dee were found guilty on this count.

The Old Pilot Plant had been used for bench-scale laboratory experiments. Operations there ceased in 1978, with chemicals left in storage in various buildings. Beginning in 1981, when they became responsible for the Old Pilot Plant, Lentz and Dee were warned on several occasions by safety inspectors that improper storage of chemicals at the Old Pilot Plant was creating a hazard and that the chemicals should be removed in accordance with APG 200–2. Although Lentz had an employee draft a cleanup plan for the Old Pilot Plant in 1983, hazardous waste chemicals remained in storage there until 1986. Dee and Lentz admitted at trial that they were aware of the storage problems at the Old Pilot Plant; Dee stated he did not consider cleanup of the building a priority.

■ Lentz and Dee contest their convictions under Count Four claiming that they could not "inherit an environmental crime." This argument borders on the frivolous. The indictment charged defendants with unpermitted storage of hazardous wastes at the Old Pilot Plant from June 1983 to August 1986. There is substantial evidence in the record that during this time period defendants were responsible for maintenance of the Old Pilot Plant, that they were aware of the hazardous condition of chemical storage there, and that they failed to ensure that the hazardous wastes were managed in accordance with RCRA. Defendants may have inherited an environmental problem, but their criminal culpability arises solely from their own ongoing failure to comply with RCRA during

---

**15.** The tanks were able to neutralize simple acids and bases, but did not provide treatment for other types of hazardous waste.

**16.** To come within this exclusion, the wastes from the Pilot Plant would have to mix with sanitary wastes from residences prior to·entering the sewage treatment facility. *See Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct & Sewer Auth.*, 888 F.2d 180, 184–86 (1st Cir.1989) (domestic sewage exclusion requires that the sanitary waste come from residences as opposed to bathrooms used by workers), *cert.*

*denied,* —— U.S. ——, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990). Furthermore, the sewage plant would have to be a "publicly owned treatment works," as that term is defined by RCRA. *See* 40 C.F.R. § 260.10.

**17.** We also need not reach appellants' argument that RCRA chemicals were not detected at "hazardous levels" in the sumps. We note, however, that RCRA flatly prohibits unpermitted disposal of hazardous wastes. The concentration of the wastes after disposal has no bearing on whether the disposal was illegal.

the period they were responsible for the Old Pilot Plant.

### V

In view of the above, the judgment of the district court is

AFFIRMED.