[No. A069766. First Dist., Div. Two. Jan. 10, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
JEFFREY J. FEINBERG, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to rules 976 and 976.1, California Rules of Court, this opinion is certified for publication with the exception of parts I through III of the Discussion.

COUNSEL

Stephen Matchett, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Stan M. Helfman and Christopher J. Wei, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KLINE, P. J.—Jeffrey J. Feinberg appeals from convictions of offering a false or forged instrument for recordation and perjury in connection with the filing of a mechanic's lien on residential property. He contends the trial court erred in admitting evidence of his financial condition, uncharged acts of fraud and prior evictions; the prosecutor committed misconduct in urging consideration of such evidence for purposes other than those for which it had been admitted; the court erred in refusing a requested pinpoint jury instruction; and the trial court erred in failing to instruct the jury on materiality as an element of the convictions.

STATEMENT OF THE CASE

Appellant was charged by information filed February 17, 1994, with one count each of offering a false or forged instrument for recordation (Pen. Code, § 115, subd. (a))[1] and perjury (§ 118). After a jury trial, he was found guilty of both counts. On April 19, 1995, appellant was placed on probation for four years, with conditions including service of one year in county jail and payment of restitution in the amount of $14,000. Appellant filed a timely notice of appeal on April 21, 1995.

STATEMENT OF FACTS

In 1993, Dr. Steven Sierra and his wife, Jacqueline Speier, owned a home at 3005 Canyon Drive in Burlingame that they were trying to sell. Appellant was the proprietor of an art gallery in Burlingame, which opened in late 1992 and closed in the spring of 1993. Sierra was interested in some of the

---

[1]All further statutory references will be to the Penal Code unless otherwise specified.

paintings in appellant's gallery. Appellant told his friend Matthew Carlin that appellant and Sierra had agreed to have appellant and his family live in the Canyon Drive home for six months in exchange for the paintings. As part of the agreement, appellant was to make the house attractive to potential buyers and available to real estate agents wanting to show the house. Sierra also traded an older Mercedes Benz for additional artwork, with the understanding that appellant would sell the car and keep the proceeds. Appellant told Carlin, "I am going to get as much as I can out of this guy"; said he was going to stay in the house as long as he could, characterizing the arrangement as a "free ride"; and told Carlin, with respect to finding places to stay without paying, "I have tricks up my sleeve."

Appellant moved into the Canyon Drive house in April 1993. The "For Sale" sign in front of the house was removed shortly thereafter. Appellant arranged with a Burlingame antique dealer to place items of furniture in the home; these were subsequently returned when appellant told the dealer the home had sold and the buyer did not want the pieces.

In mid-April, real estate broker Carol Bullock showed the Canyon Drive house to Gary and Faye Roper. Bullock had difficulty contacting appellant to arrange for the showing, and when she did show the house to the Ropers, appellant and his wife accompanied them throughout the house. A contract for sale of the house was concluded on June 25. When the buyers' inspections were performed, appellant was present and pointed out a number of defects.

Under the sales agreement, the Ropers were to move into the house on August 15; this date was later extended because appellant had not found another place to live. At Sierra's request, Bullock showed appellant approximately eight rental properties; when appellant eventually agreed to one of them, in the $2,800 to $3,000 price range appellant had specified, the landlord would not rent it to appellant because of his financial status. Sierra offered to help appellant pay the first month's rent and security deposit and to cosign the lease.

A few days before August 23, when the Ropers were due to move into the Canyon Drive house, appellant called Bullock and said he was "sick and tired of being pressured on moving out of his home" and that he was very upset and close to a "breakdown." On August 23, appellant filed a mechanic's lien on the Canyon Drive property with the county recorder and delivered copies to Bullock's office. The lien was in the amount of $18,400 and stated it was for "exstensive [sic] improvements to procure sale and services rendered." The lien was never served on Sierra or Speier. After learning of

the lien, on August 24 or 25, the Ropers decided not to go through with purchase of the property.

Speier made a complaint to the district attorney's office about the mechanic's lien. Inspector Randy Curtis was assigned to the case. Curtis met with Sierra on August 27 and arranged for Sierra to tape-record telephone conversations with appellant.

In a telephone conversation on August 30, Sierra told appellant the lien was a fabrication and had upset the prospective buyer and said it was imperative that the lien be removed. Asked if he had found a place to live, appellant said he had two "on the line" and was "getting [his] act together." Sierra told appellant to let him know if there was anything Sierra could do to assist him, reminded him the Ropers were expecting to move in on September 7, and told him to expect a letter from Sierra's lawyer demanding removal of the lien. Appellant complained that the prospective buyers had had his utilities turned off.

In another telephone conversation on September 7, appellant said he had not yet found a place to live and Sierra told him their original agreement had called for appellant to have vacated the property the day before. Sierra asked what appellant had done about the lien and appellant said he wanted to meet with Sierra to discuss it, but denied being "under any perjury whatsoever." Sierra asked how appellant had "come up with" the $18,400 amount, and appellant again said he wanted to meet in person to discuss this. Sierra told appellant there had been no agreement for appellant to do anything, and appellant had not done anything, to which appellant responded that he had helped sell the house. Sierra said "your agreement was to, to make the house look nice as part of your rental thing like you normally do for your own house to make it marketable, that was part of the agreement, and that's why you were allowed to move in with, uh, you know, no, no deposit, no nothing else, and just uh, uh, so, sort of what we both perceived as a win-win for both of us. I mean, you getting out of paying $3,100 dollars a month for five months, and then me getting that equivalent in art work. And then, but your agreement was to be out by the 6th." Appellant said he understood this and Sierra said, "there was absolutely no uh, basis, no agreement between you or me to do a single thing with regard to the house, and nothing has been done. It was a new house." Appellant replied, "I understand all that."

Also on September 7, Curtis accompanied Sierra to a meeting with appellant at the Bistro Cafe in Burlingame. Curtis testified that appellant arrived with a man named Spencer Sutton. Initially, Sierra gave appellant a check for $200 he owed for the purchase of paintings separate from the

house deal. Sierra then asked appellant about the mechanic's lien. Sutton responded that he was a landlord and told Sierra to be careful when accusing someone of trespassing; he said he knew from personal experience it could take five or six months to evict someone. Sutton read to Sierra a definition of a mechanic's lien, which referred to improvements to the property, and Sierra responded that no improvements had been made to the Canyon Drive property. Sierra reiterated his agreement with appellant: In exchange for nine paintings, appellant was to move into the house until September 6, 1993, make it attractive to potential buyers and available to real estate agents, and receive a credit for the fair market value of $3,100 per month. Sierra said this was the complete agreement and the mechanic's lien was therefore perjurious.

Appellant responded in strident tones that he made his living from living in people's houses and decorating them with his furniture and art, substantially increasing the value of the homes, and that he had been instrumental in the sale of over $3 million worth of real estate. Appellant said he should be compensated for moving his own furnishings and art into the house. With respect to the amount of $18,400 claimed on the lien, Sutton said the check Sierra had just given appellant for $200 would be applied toward the lien amount, $5,900 was for "lost opportunity," $6,000 was for a deal appellant had lost because the telephone service had been turned off, and $7,000 was for appellant's moving his furniture and art into the house. When Sierra said he had never turned off the telephone service, Sutton told him courts would view him as a principal and hold him responsible. Sierra accused appellant of hindering the sale of the house, which appellant denied. Several times during the meeting Sierra reiterated the terms of his agreement with appellant; appellant never denied this being the agreement. Appellant indicated the deal had been bad for him financially, complaining that the City of Burlingame had told him he could not sell paintings out of Sierra's house. Appellant said he had delivered the lien to Bullock's office because he "felt it was the right thing to do." Appellant claimed he did not know the buyers were backing out of the contract because of the lien. Curtis asked appellant if he would be taking his furniture and paintings out of the house when he left, explaining that if he was leaving them there might be an improvement to the house but if he was taking them the lien represented rent Sierra owed appellant for temporarily moving the furniture and art into the house. Appellant claimed to not understand the question but Sutton said appellant would be taking the furniture and art with him when he left. Curtis asked Sutton for identification but Sutton refused. Curtis was unable to find him after the meeting. The parties stipulated that Sutton was not and never had been a landlord or a lawyer.

Appellant never sued Sierra or Speier for the $18,400 after the court removed the lien. Speier had to have appellant evicted from the house. After

appellant moved out, Speier found the carpet dirty and floors damaged. The utility bill for the house was in the name of appellant's seven- or eight-year-old daughter.

About a month before he moved out of the Canyon Drive house, appellant held a garage sale at which paintings, furniture and a red Mercedes were offered for sale. One neighbor testified that appellant held a garage sale about once a month, until she complained to the city attorney and the sales stopped.

The agent for a Foster City landlord testified that he had had appellant evicted from a rental property by means of an unlawful detainer action in 1992. He acknowledged that appellant had filed a cross-complaint complaining about the water heater, and that he had had the water heater replaced the next day. An El Granada landlord testified that he had had appellant evicted by means of an unlawful detainer action in 1991.

Matthew Carlin testified that he loaned appellant $2,500 in connection with the opening of appellant's art gallery in Burlingame, installed a marble showcase in the gallery at a cost of about $1,200, loaned appellant $1,200 for a rug for the gallery, and gave appellant some large plant pots to use in the gallery. After the gallery opened, appellant told Carlin the business was failing and appellant had no money coming in, and continued to borrow money from Carlin for living expenses. Appellant never repaid Carlin's loans.

Real estate agent Jeanne Schroeder testified that on October 19, 1992, she loaned appellant $7,500 in connection with the art gallery, with the agreement that appellant would repay $10,000 in 120 days. She loaned appellant an additional $1,650 on December 14, 1992. Despite demands for repayment, Schroeder never received payment from appellant on the loans, and was unable to contact appellant after the gallery closed.

DISCUSSION

I.-III.*

. . . . . . . . . . . . . . . . . . . . . . . .

IV.

Appellant contends his perjury conviction must be reversed per se because the trial court failed to instruct the jury that in order to convict appellant of

*See footnote, *ante*, page 1566.

perjury, it had to find appellant's false statement was material. The perjury instruction, CALJIC No. 7.21 (1990 rev.) quoted in the unpublished section of this opinion, initially stated that "[e]very person who declares under penalty of perjury and willfully states as true any *material* matter which is false, and which such person knows to be false, is guilty of the crime of perjury in violation of Penal Code section 118." (Italics added.) The instruction went on to list four elements the jury was required to find, none of which referred to materiality of the statement. The instruction did not define materiality.

In *People* v. *Kobrin* (1995) 11 Cal.4th 416 [45 Cal.Rptr.2d 895, 903 P.2d 1027], our Supreme Court altered previously existing law by holding that materiality is an element of the crime of perjury that must be determined by the jury. (See *United States* v. *Gaudin* (1995) 515 U.S. 506 [132 L.Ed.2d 444, 115 S.Ct. 2310] [materiality in prosecution under 18 United States Code section 1001 is jury question].)[5] In *Kobrin*, the defendant, charged with perjury based upon an affidavit submitted in support of a temporary restraining order, claimed the false portions of the affidavit were not material to the decision to issue the order in light of true statements also contained in the affidavit. The court instructed the jury, in accordance with CALJIC No. 7.21 (5th ed. 1989): "If you find the defendant made one or more of the statements [recited by the court as part of the instruction], said statements were material matters within the definition of perjury read to you." This removal of the issue of materiality from the jury's consideration required reversal of the conviction. (11 Cal.4th at p. 430.)

In *Kobrin*, our Supreme Court stated that both it and the United States Supreme Court had "strongly implied" that "omitting to instruct on an element of an offense" was reversible per se and devoted several paragraphs of discussion to reasons why the error in that case was not susceptible to harmless error analysis. (11 Cal.4th at pp. 428-430.) In part, *Kobrin* likened the situation in that case to that in *Sullivan* v. *Louisiana* (1993) 508 U.S. 275 [124 L.Ed.2d 182, 113 S.Ct. 2078], which held that harmless error analysis could not be applied where the jury was given a constitutionally defective reasonable doubt instruction because the erroneous instruction vitiated the entire verdict, making it impossible to determine that the same verdict would

---

[5]Prior to *Kobrin*, the long-standing rule had been that the issue of materiality was a question of law for the court. (*People* v. *Kobrin*, *supra*, 11 Cal.4th at p. 419; *People* v. *Lem You* (1893) 97 Cal. 224 [32 P. 11].)

CALJIC No. 7.21 (1996 rev.) now provides a definition of materiality and includes materiality in the list of enumerated elements of the offense.

have been reached in the absence of the error.[6] *Kobrin* stated: "[T]he jury's findings on materiality were not merely imperfect, they were nonexistent due to the instructional omission. Thus, '[t]here is no *object*, so to speak, upon which harmless-error scrutiny can operate.'" (*People* v. *Kobrin, supra*, 11 Cal.4th at p. 429, quoting *Sullivan* v. *Louisiana, supra*, 508 U.S. at p. 280 [124 L.Ed.2d at p. 190].) Nevertheless, at the conclusion of the opinion, *Kobrin* declined to decide whether "omission of instruction" on an element of an offense was reversible per se or subject to harmless error analysis under *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065], finding reversal required even under the latter standard. (*Kobrin, supra*, 11 Cal.4th at p. 428, fn. 8, 430, 432 (conc. opn. of Mosk, J.).)

In *People* v. *Avila* (1995) 35 Cal.App.4th 642 [41 Cal.Rptr.2d 484], the trial court failed to instruct the jury on an element of the offense of kidnapping with intent to rape, that the movement of the victim substantially increased the risk of harm over and above that necessarily present in the commission or attempted commission of rape. After lengthy analysis of federal and state authority on the subject, *Avila* concluded that this error in omitting instruction on an element of the offense was susceptible to harmless

---

[6]*Sullivan* explained that the question in *Chapman* harmless error review "is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. [Citation.] Harmless-error review looks, we have said, to the basis on which 'the jury *actually rested* its verdict.' [Citation.] The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee. [Citations.]" (*Sullivan* v. *Louisiana, supra*, 508 U.S. at p. 279 [124 L.Ed.2d at p. 189].) Applied to the improper reasonable doubt instruction at issue in *Sullivan*, the Court continued: "Since, for the reasons described above, there has been no jury verdict within the meaning of the Sixth Amendment, the entire premise of Chapman review is simply absent. There being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the *same* verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless. There is no *object*, so to speak, upon which harmless-error scrutiny can operate. The most an appellate court can conclude is that a jury *would surely have found* petitioner guilty beyond a reasonable doubt—not that the jury's actual finding of guilty beyond a reasonable doubt *would surely not have been different* absent the constitutional error. That is not enough." (*Id.*, at p. 280 [124 L.Ed.2d at pp. 189-190].)

*Sullivan* further distinguished between "'structural defects in the constitution of the trial mechanism, which defy analysis by "harmless-error" standards,' and on the other hand, trial errors which occur 'during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented.'" It found denial of the right to a jury verdict of guilt beyond a reasonable doubt an error of the former type, "the jury guarantee being a 'basic protectio[n]' whose precise effects are unmeasureable, but without which a criminal trial cannot reliably serve its function [citation]." (*Sullivan* v. *Louisiana, supra*, 508 U.S. at p. 281 [124 L.Ed.2d at pp. 190-191].)

error analysis. The opinion quoted at length from *Rose* v. *Clark* (1986) 478 U.S. 570, 576-577 [92 L.Ed.2d 460, 469-470, 106 S.Ct. 3101], a case involving an improper presumption instruction, which noted that harmless error analysis could not be used where the error in question rendered the trial "fundamentally unfair" (for example, introduction of a coerced confession, complete denial of the right to counsel, adjudication by a biased judge, directed verdict for the prosecution). (*People* v. *Avila, supra,* 35 Cal.App.4th at pp. 654-656.) *Rose* stated, "We have emphasized, however, that while there are some errors to which *Chapman* does not apply, they are the exception and not the rule. [Citation.] Accordingly, if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." (478 U.S. at pp. 578-579 [92 L.Ed.2d at p. 471].)

■ Appellant contends that the jury instructions in the present case removed the element of materiality from the jury's consideration, requiring reversal of his perjury conviction without application of any harmless error analysis. We disagree with this characterization. The perjury instruction in this case told the jury that every person "who declares under penalty of perjury and willfully states as true any *material* matter which is false and which such person knows to be false" is guilty of perjury. (Italics added.) Unlike *Kobrin* and *United States* v. *Gaudin, supra,* 515 U.S. 506 in which cases the trial court affirmatively removed the issue of materiality from the jury's consideration and decided it as a matter of law, here the instruction informed the jury at the outset that a perjury conviction could only be based on a *material* statement. What the instruction failed to do was provide the jury with a definition of materiality and reiterate, in enumerating the elements to be proven, that the statement had to be material.

■ The test for whether a statement is material has been stated as "whether the statement or testimony 'might have been used to affect [the proceeding in or for which it was made]'" (*People* v. *Kobrin, supra,* 11 Cal.4th at p. 420, quoting section 123) or "whether the statement could probably have influenced the outcome of the proceedings." (*People* v. *Pierce* (1967) 66 Cal.2d 53, 61 [56 Cal.Rptr. 817, 423 P.2d 969].) The term "material" thus has a specialized meaning within the context of a perjury charge. (*People* v. *Wade* (1995) 39 Cal.App.4th 1487, 1495 [46 Cal.Rptr.2d 645] [distinguishing *Pierce* definition for purposes of perjury conviction from "ordinary meaning" of term used in CALJIC No. 2.21.2 on distrusting false witness].)[7] Where the terms used in an instruction have a " ' "technical

---

[7]Webster's Ninth New Collegiate Dictionary defines "material" as "having real importance or great consequences." (Webster's New Collegiate Dict. (9th ed. 1984) p. 733.)

meaning peculiar to the law[,]" ' " the trial court has a sua sponte duty to give instructions defining the terms. (*People* v. *Richie* (1994) 28 Cal.App.4th 1347, 1360 [34 Cal.Rptr.2d 200].)

 Given the absence of a definition of the term "material" and failure of the court's instruction to reiterate the materiality requirement in the specifically enumerated list of elements of the charge, we are convinced the perjury instruction was inadequate. It did not, however, completely remove the issue of materiality from the jury. As the court concluded in *Avila*, ". . . this case is more akin to a situation where a constitutionally deficient jury instruction relating to a single element of an offense or a defense is presented to the jury," a situation in which the United States Supreme Court has applied harmless error analysis. (*People* v. *Avila*, *supra*, 35 Cal.App.4th at p. 659.)[8] In *Pope* v. *Illinois* (1987) 481 U.S. 497 [95 L.Ed.2d 439, 107 S.Ct. 1918], for example, the jury was incorrectly instructed to determine whether allegedly obscene material had value by reference to a community standard rather than a "reasonable person" standard. The court stated that ". . . if a reviewing court concludes that no rational juror, if properly instructed, could find value in the magazines, the convictions should stand." (*Id.*, at p. 503 [95 L.Ed.2d at p. 447].)

Here, the jury *was* instructed that the statement had to be material, but was not given a legal definition of the term "material." Applying a common definition of the term, the jurors would have had to conclude that the statement had "real importance or great consequences," a definition quite similar to the legal one. In any event, if no reasonable juror could have found the statement in question was immaterial, reversal is not required. Unlike the situation in *Kobrin*, where the allegedly perjurious affidavit contained multiple statements, some true and some false, here the jury was told the perjury charge was based on one statement, the representation that the lien was for "extensive improvements." Since the purpose of the document was to state a

---

[8]*Avila* described *Sullivan* as the sole post-*Rose* case in which the United States Supreme Court applied a reversible per se test to instructional error. (*People* v. *Avila*, *supra*, 35 Cal.App.4th at p. 659.) Since *Avila* was decided, *United States* v. *Gaudin*, *supra*, 515 U.S. 506, also reversed without engaging in a harmless error analysis, although it did not discuss the proper standard for review since the government had conceded the issue of prejudice. (See 515 U.S. at pp. ___-___ [132 L.Ed.2d at pp. 459-461, 115 S.Ct. at pp. 2321-2322] (conc. opn. of Rehnquist, C. J.).) The Ninth Circuit's opinion had determined that the removal of the issue of materiality from the jury was a "fundamental structual error" that could not be found harmless. (*U.S.* v. *Gaudin* (9th Cir. 1994) 28 F.3d 943, 951-952.) *Gaudin*, as stated above, was a case in which, as in *Kobrin*, the issue of materiality had been affirmatively removed from the jury and decided by the court.

claim for money owed for materials or services, it is inconceivable that a reasonable juror could have viewed the reason for the claim as immaterial.[9]

■ Appellant also contends his false instrument conviction must be reversed because materiality, he claims, is an element of that offense as well. Appellant concedes no appellate court has addressed the question whether materiality is an element of the offense described in section 115, but offers two he characterizes as having "assumed" it to be. *Generes* v. *Justice Court* (1980) 106 Cal.App.3d 678, 682 [165 Cal.Rptr. 222], concerned the question whether a person who filed a deed purporting to convey to herself from herself an easement she did not possess could be found guilty of violating section 115. Concluding that the complaint did state an offense, the court stated: "Here the lack of an ownership interest in the land goes to the

---

[9]In urging the rule of per se reversal applies in the present case, appellant relies upon *Cabana* v. *Bullock* (1986) 474 U.S. 376, 384-385 [88 L.Ed.2d 704, 715-716, 106 S.Ct. 689], Justice Scalia's concurring opinion in *Carella* v. *California* (1989) 491 U.S. 263, 267 [105 L.Ed.2d 218, 109 S.Ct. 2419], *Sullivan* v. *Louisiana, supra,* 508 U.S. at pages 278-281 [124 L.Ed.2d. at pages 189-190], and the Ninth Circuit cases *Harmon* v. *Marshall* (9th Cir. 1995) 57 F.3d 763 (which has been superceded by a modified opinion at 69 F.3d 963), *U.S.* v. *Hove* (9th Cir. 1995) 52 F.3d 233, 235-236, *U.S.* v. *Stein* (9th Cir. 1994) 37 F.3d 1407, 1410, and *U.S.* v. *Gaudin, supra,* 28 F.3d 943, 952.

The passage from *Cabana* v. *Bullock* upon which appellant relies has been disapproved by the United States Supreme Court. In *Pope* v. *Illinois, supra,* 481 U.S. at pages 503-504, footnote 7 [95 L.Ed.2d at page 447], the court stated: "To the extent that cases prior to *Rose* may indicate that a conviction can never stand if the instructions provided the jury do no require it to find each element of the crime under the proper standard of proof, see, *e.g., Cabana* v. *Bullock,* 474 U.S. 376, 384 [88 L.Ed.2d 704, 715, 106 S.Ct. 689] (1986), after *Rose* they are no longer good authority." *Carella* v. *California, supra,* 491 U.S. 263, held that error in jury instructions employing conclusive presumptions *could* be reviewed under a harmless error test.

*Harmon* v. *Marshall, supra,* found the failure to instruct on *any* of the elements of an offense could not be subjected to harmless error analysis. (See *People* v. *Cummings* (1993) 4 Cal.4th 1233 [18 Cal.Rptr.2d 796, 850 P.2d 1] [instructional error removing from jury consideration substantially all of the elements of an offense reversible per se].) *U.S.* v. *Hove, supra,* 52 F.3d at pages 235-236, and *U.S.* v. *Stein, supra,* 37 F.3d at page 1410, found instructional errors omitting one element of an offense reversible per se. These two cases were disapproved by the Ninth Circuit for failing to distinguish between instruction that affirmatively remove an element of an offense from the jury's consideration and instructions that merely omit reference to an element of the offense. (*Roy* v. *Gomez* (9th Cir. 1996) 81 F.3d 863, 867, fn. 3.) *Roy* found omission of an element of aider and abettor liability subject to harmless error analysis. (*Id.,* at p. 866; see, *U.S.* v. *Whitmore* (9th Cir. 1994) 24 F.3d 32, 37 [omission of instruction on one element of offense harmless error].) *Roy* was recently vacated by the United States Supreme Court, which held the Ninth Circuit had utilized too strict a form of harmless error analysis. (*California* v. *Roy* (1996) __ U.S. __ [136 L.Ed.2d 266, 117 S.Ct. 337].) None of the cases upon which appellant relies convince us that the error in the present case, which does not even rise to the level of complete removal of an element of the offense, is not susceptible to harmless error review. (See *People* v. *Avila, supra,* 35 Cal.App.4th at pp. 661-662, fn. 11 [reviewing 9th Cir. cases and deciding issue controlled by *Pope* v. *Illinois, supra,* 481 U.S. at p. 504, fn. 7 (95 L.Ed.2d at p. 447)].)

deception itself. If [the defendant] did not own the interest she purported to convey, the instrument she filed was clearly false. Having no right to grant or convey an easement, her recording of a deed transferring an easement would establish a cloud on the title of those persons who lawfully owned interests in the land. A title searcher encountering the spurious document who acted upon it as genuine would of course be materially deceived." *People* v. *Gangemi* (1993) 13 Cal.App.4th 1790, 1795 [17 Cal.Rptr.2d 462], quoted *Generes* in concluding that fines imposed under section 115.5 for filing a false instrument affecting title to or encumbering certain real property could be imposed upon a person who filed a fraudulent deed of trust on his own property. Neither of these cases involved any question whether the falsity of the instrument in question was material and we do not consider them authority for the proposition that materiality is an element of the offense of offering a false instrument.

The terms of section 115 do not suggest materiality is an element of the offense. Section 115 simply provides: "Every person who knowingly procures or offers any false or forged instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States, is guilty of a felony." This is to be contrasted with section 118, which provides that the offense of perjury is committed by a person who declares under penalty of perjury "and willfully states as true any *material* matter which he or she knows to be false." The chapter of the Penal Code in which section 118 appears is entitled, "Perjury and Subornation of Perjury," and the sections within the chapter similarly contain express materiality requirements. (§§ 118.1 [peace officers' false report], 118a [false affidavit as to testimony], 123 [ defendant's lack of knowledge of materiality of false statement not a defense to perjury].) The chapter in which section 115 appears, "Forging, Stealing, Mutilating, and Falsifying Judicial and Public Records and Documents," does not refer to materiality. (§§ 113 [manufacturing or selling false government document], 114 [use of false citizenship documents], 115.1 [use of unauthorized signatures in campaign advertisements], 115.2 [false representations in campaign advertisements], 115.25 [inaccurate emergency service phone numbers in campaign advertisements], 115.3 [altered copies official documents], 115.5 [false or forged documents relating to single-family residences], 116 [tampering with jury list], 116.5 [tampering with jury], 117 [falsification of jury list].) Although not specifically considering section 115, our Supreme Court in *Kobrin, supra,* recognized the existence of crimes of falsity that do not have a materiality requirement: After noting that section 118 and common law made materiality an element of perjury, the court stated, "Moreover, without a requirement of materiality, the crime would be false swearing rather than perjury." (*People* v. *Kobrin, supra,* 11 Cal.4th at p. 427.)

"The core purpose of Penal Code section 115 is to protect the integrity and reliability of public records." (*People* v. *Bell* (1996) 45 Cal.App.4th 1030, 1061 [53 Cal.Rptr.2d 156]; *People* v. *Parks* (1992) 7 Cal.App.4th 883, 887 [9 Cal.Rptr.2d 450].) This purpose is served by an interpretation that prohibits any knowing falsification of public records. Accordingly, we will not insert into section 115 a requirement of materiality that the Legislature did not see fit to include.

The judgment is affirmed.

Haerle, J., and Lambden, J., concurred.

On February 5, 1997, the opinion was modified to read as printed above.