Filed 11/2/22  P. v. Arlov CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>GALINA ALEXANDRIA ARLOV,<br><br>        Defendant and Appellant. | A163674<br><br>(Lake County<br>Super. Ct. No. CR945634) |

Defendant Galina Arlov was placed on probation after a jury convicted her of welfare fraud and two counts of perjury, all felonies, in connection with her receipt of food stamps, and misdemeanor elder abuse, in connection with her care of her mother.  On appeal, Arlov claims that (1) the trial court erred by denying her motion to suppress evidence supporting the elder-abuse conviction and (2) insufficient evidence supports one of the perjury convictions.  We affirm.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

*A.    Background and the Underlying Conduct*

In 2013, Arlov moved from New York to a residence in Kelseyville, which was owned by a trust for which she was a trustee.  The following year, in early August 2014, she applied for CalFresh benefits (food stamps) through

1

the Lake County Department of Social Services (Department).  The application was successful, and Arlov began receiving benefits.  At the time, food stamps were provided through an electronic benefit card (EBT card), which required a PIN to use.

On the CalFresh application, Arlov stated under penalty of perjury that her "household's monthly gross income and cash on hand or in checking and savings accounts [was] less than the combined cost of rent/mortgage and utilities."  She also claimed that she paid $350 per month in rent and, as discussed further below, had no income.

In fact, bank records from accounts controlled by Arlov showed regular deposits and her use of that money for personal expenses.  To begin with, a disability benefit of $781 was deposited monthly into her personal account, which she did not disclose on the CalFresh application even though there was a checkbox for such income.  The trust account showed deposits totaling $1,400 between May and August 2014, with several hundred dollars being spent at Lake County grocery stores and other businesses.  An account in the name of Arlov's web development company showed deposits totaling approximately $7,000 between May and July 2014.  And finally, within days after submitting the CalFresh application, Arlov began receiving income from Airbnb for renting out the Kelseyville residence.  For the month of August 2014, this income totaled approximately $1,900, which was deposited into Arlov's business account.

Arlov, who testified in her own defense, claimed that the expenditures from the trust account were on behalf of workers who performed projects to improve the Kelseyville property.  Similarly, she claimed that she rented out the residence on Airbnb as part of her obligations to the trust and did not use the income for her personal expenses.  Finally, she claimed that she intended

2

to transform her company into a "nonprofit business," and the expenditures from that account were likewise not for her personal expenses.

In early 2015, Igor B., an acquaintance of Arlov's from New York, moved to the Kelseyville residence to help her maintain the property. In July of the following year, Arlov moved her elderly parents to the residence from New York after learning her father had terminal cancer. Arlov's father died a few days after arriving in California. Her mother, Aza Shmirun, who was then 73 years old, continued to live with Arlov.

Arlov, an only child, inherited a significant amount of money from her father. Hundreds of thousands of dollars were deposited into Arlov's personal account between June and August 2016, and she received over $16,000 in Airbnb income that year. In August 2016, she purchased an Airstream trailer for approximately $105,000, paying in full. Two days later, she purchased a truck from a Toyota dealership for approximately $54,000, again paying in full.

Arlov testified that she stopped using her CalFresh benefits in June 2016 and did not use them again. But that November, she submitted to the Department a recertification application to renew her benefits. She again stated under penalty of perjury that no one in her household was receiving income or "money from any other source."

At trial, Arlov claimed that she did not submit the recertification application and that her signature was forged. She admitted that she had a recertification interview with a Department worker, but she testified that she told the worker she no longer needed food stamps and the worker "said just don't use the card." Arlov claimed that after she stopped using the EBT card, Igor B. continued to use it without her permission or knowledge, implying that he was the one who submitted the recertification application.

3

In August 2016, Igor B. had a falling-out with Arlov and moved from the Kelseyville residence into a detached garage on the property. That November, Arlov moved Shmirun into the garage with him. Arlov claimed that she thought the garage would be a safer place for her mother to stay because Shmirun was having cognitive difficulties, and it was easier to control her behavior in a smaller space. Arlov also testified that Shmirun liked her living quarters kept "very hot," and it was easier to keep the garage heated.

The same month, Arlov went to New York for about a month to renovate her parents' old apartment, leaving Shmirun in Igor B.'s care. In late November, shortly before Arlov returned from New York, Shmirun, who was noted to be "very weak," was admitted to the hospital. Although Arlov reported her suspicion that Igor B. was abusing Shmirun, Shmirun said she felt safe going home with him.

In early December, Arlov brought Shmirun back to the hospital because Shmirun had been bitten by the family dog. Medical records also noted that Shmirun had a sprained arm, fractured wrist, fractured fingers, and "[e]arly onset Alzheimer's dementia without behavioral disturbance." A week later, Arlov brought her to the hospital again because the dog bite needed to be "reassessed" and Shmirun appeared to be declining mentally.

In early 2017, Arlov left for another long trip to New York, again leaving Shmirun in Igor B.'s care. While Arlov was gone, Shmirun burned her hand because the bandages for the dog bite ignited when "[s]he went to throw a log on a fire." In late January, after returning to California, Arlov brought Shmirun to the hospital for further treatment for the burns.

4

## B.    *The Investigation*

On the night of February 11, 2017, a Lake County sheriff's deputy, Jose Martinez, responded to Arlov's residence and contacted Igor B.  Igor B. led Deputy Martinez to the garage, which "appeared to have been turned into living quarters."  The garage had a kitchen, a living room, a bathroom, and a bed, next to which "was a wood-burning stove that had a fire going."  One side of the bed had cinderblocks next to it, apparently to protect it from the stove.  The floors were "bare concrete," and the garage was not insulated.

Shmirun and Arlov were lying on the bed together.  Deputy Martinez testified that Shmirun was "frail" and "hardly moved" or spoke while he was there.  About an hour later, a sergeant arrived to assist Deputy Martinez, and Arlov was arrested.  Ultimately, Shmirun was appointed a conservator, and she died in a nursing home in 2019.

On February 16, five days after Arlov was arrested, two welfare-fraud investigators visited the residence again and contacted Igor B.  Igor B. brought the investigators into the house, which "looked like it was well kept" and "in good shape."  The interior, including a distinctive copper bathtub, matched photographs on an active Airbnb listing.  Based on the Airbnb information and other financial records, a Department eligibility specialist calculated that Arlov was overpaid approximately $3,000 in CalFresh benefits between December 2015 and April 2017.  This included a time period when Arlov was in jail and someone else used her EBT card.

## C.    *Procedural History*

Arlov was charged with six felony counts:  elder abuse, theft from an elder, vandalism, welfare fraud, and two counts of perjury.  She was also

5

charged with a misdemeanor count of elder abuse.[1]  The theft count was accompanied by allegations that she took property of a value exceeding (1) $65,000 and (2) $200,000.[2]

At the People's request, during trial the trial court dismissed the vandalism charge and the allegations accompanying the charge of theft from an elder.  Arlov also successfully moved to dismiss the felony elder abuse count.  The jury acquitted her of theft from an elder and convicted her of the remaining counts.  The court suspended imposition of the sentence and placed her on probation for two years.

## II.
### DISCUSSION

A.      *The Trial Court Properly Denied the Motion to Suppress.*

Arlov claims the elder-abuse conviction must be reversed because the trial court prejudicially erred by denying her motion to suppress.  Relying on *Georgia v. Randolph* (2006) 547 U.S. 103 (*Randolph*), she claims that Igor B.'s consent did not validate Deputy Martinez's entry into the garage because she was also present and refused consent.  We are not persuaded.[3]

---

[1] The charges were brought under Penal Code sections 368, subdivisions (b)(1) (felony elder abuse), (c) (misdemeanor elder abuse), and (d) (theft from elder), 594, subdivision (a) (vandalism), 118, subdivision (a) (perjury), and Welfare and Institutions Code section 10980, subdivision (c)(1) (welfare fraud).  All further statutory references are to the Penal Code.

[2] The allegations were made under section 12022.6, subdivisions (a) and (a)(2), respectively.

[3] Because we conclude that Arlov's claim fails on the merits, we need not address the Attorney General's arguments that Arlov forfeited the claim by failing to raise it below and that the search was also justified by the inevitable discovery doctrine.

6

1.    Additional facts

Before trial, Arlov filed a motion under section 1538.5 to suppress "[a]ll of the photos taken . . . and observations made of the interior of [her] premises" on February 11, 2017, evidence that was relevant to establish the garage's condition when Shmirun lived there, as obtained in violation of Arlov's Fourth Amendment rights.  The prosecution responded that the February 11 search, which was concededly warrantless, was lawful because Igor B. "consented to the contact and had the apparent authority to allow the search."

At a hearing on the motion, Deputy Martinez testified that after arriving at the Kelseyville property on February 11, he and Igor B. spoke across the street from it.  Igor B. told the deputy that "he lived in the garage of the residence" and called 911 after he saw Arlov inside the garage, damaging some of his electronics.  Igor B. "escorted" Deputy Martinez into the garage, where Arlov was with Shmirun.  The deputy testified that he spoke to Arlov, who said that Igor B. was Shmirun's caregiver and lived there "in exchange for food and rent."

At the hearing, the defense introduced a snippet of a recording from Deputy Martinez's personal audio device.  On the recording, the following exchange occurred:

> ARLOV:        Get out of my house.
>
> MARTINEZ:     Galina, no one's leaving right now.
>
> ARLOV:        Okay.  Well, you have to—
>
> MARTINEZ:     We're still—
>
> ARLOV:        —call my attorney.  He stole my phone.  I
>               cannot get my attorney.  My attorney's Robert

7

Riggs. Please call him.

MARTINEZ: Okay. Let me grab my stuff. I want to make sure my stuff don't end up missing.

On cross-examination, Deputy Martinez agreed that he "did . . . activate [his personal audio device] at some point," but he could not recall when he did so. He also recalled Arlov telling him to get out, but he testified that he did not "remember if it was when [he] entered the home." He explained that the encounter "was a fairly long contact" during which he moved in and out of the garage. He did, however, recall that Arlov "became upset" with the sergeant when the sergeant arrived.

The trial court denied the motion to suppress evidence from the February 11 search. The court found that Igor B. "did have apparent or actual authority to permit entry into the . . . garage," because he told Deputy Martinez "that he was a co-habitant, perhaps a domestic consort to [Arlov], a caregiver," and "he was the complainant to law enforcement that evening regarding [Arlov] and her alleged damage to his personal property." The court also found that the deputy did not exceed the scope of Igor B.'s consent and "had a reasonable and good faith belief that [Igor B.] had authority to allow entry and access." Finally, the court found that this "initial justification[]" for the search was not "negated by the subsequent statement of Ms. Arlov, '[G]et out of my house.' "

2.     Analysis

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures' by police officers and other government officials. (U.S. Const., 4th Amend.) The touchstone of Fourth Amendment analysis is whether a person has a constitutionally protected reasonable expectation of

8

privacy, that is, whether [the person] has manifested a subjective expectation of privacy in the object of the challenged search that society is willing to recognize as reasonable." (*People v. Robles* (2000) 23 Cal.4th 789, 794–795 (*Robles*).) It is uncontested that Arlov had a reasonable expectation of privacy in the garage because it was "attached or adjacent to [her] home." (*Id.* at p. 795.)

"Under the Fourth Amendment, a warrantless search of such an area is unreasonable per se unless it falls within a recognized exception to the warrant requirement." (*Robles*, *supra*, 23 Cal.4th at p. 795.) The prosecution bears the burden of proving that a warrantless search was justified. (*People v. Williams* (1999) 20 Cal.4th 119, 127.) In reviewing a ruling on a motion to suppress, " '[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' " (*People v. Redd* (2010) 48 Cal.4th 691, 719.)

"The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." (*Randolph*, *supra*, 547 U.S. at p. 106.) *Randolph* established "a narrow exception to this rule, holding that the consent of one occupant is insufficient when another occupant is present and objects to the search." (*Fernandez v. California* (2014) 571 U.S. 292, 294.)

In *Randolph*, a wife told a police officer "that there were ' "items of drug evidence" ' in the house" where she lived with her husband. (*Randolph*, *supra*, 547 U.S. at p. 107.) The officer asked the husband, who was also

9

present, "for permission to search the house, which he unequivocally refused." (*Ibid.*) The officer then obtained consent for the search from the wife, entered the house, and found drug paraphernalia. (*Ibid.*) The husband was criminally charged and unsuccessfully moved to suppress the evidence on the basis that the warrantless search was "unauthorized by his wife's consent over his express refusal." (*Id.* at pp. 107–108.) The Supreme Court agreed that the search was invalid, concluding that where one occupant gives permission to search but a co-occupant "is present at the scene and expressly refuses to consent," the co-occupant's "refusal to permit entry prevails, rendering [a] warrantless search unreasonable and invalid as to [the co-occupant]." (*Id.* at p. 106.)

Arlov claims that the facts here are "squarely in line with [those in] *Randolph*," because "Deputy Martinez was presented with dueling consent/non-consent by occupants of the same residence." Unlike the *Randolph* defendant, however, Arlov did not refuse consent before Deputy Martinez entered the garage. This is significant, because as the Supreme Court subsequently clarified, *Randolph* "applies only when the objector is standing in the door saying 'stay out' when officers propose to make a consent search." (*Fernandez v. California, supra*, 571 U.S. at p. 306; see *People v. Ledesma* (2006) 39 Cal.4th 641, 704, fn. 16 [*Randolph* inapplicable where defendant not present when law enforcement received consent to enter].) Because Arlov did not tell Deputy Martinez to leave until after he entered the garage, her claim under *Randolph* fails.[4]

---

[4] We do not consider whether Arlov made her statement before Deputy Martinez took photographs inside the garage, as she does not argue that the admissibility of those photographs should be analyzed differently than the admissibility of the deputy's observations of the garage's interior.

In arguing otherwise, Arlov claims "there is some ambiguity about whether [she] told [Deputy] Martinez to leave before or after he entered her garage." She contends this factual issue should be resolved in her favor because the prosecution had the burden of proof. We disagree that the record is ambiguous on this point. Deputy Martinez testified that upon entering the garage, he saw Arlov and Shmirun lying on the bed, meaning Arlov was already inside. In addition, Deputy Martinez's testimony that Arlov became upset when the sergeant arrived suggested that she made the recorded statement at that point, not when Deputy Martinez originally contacted her. And finally, her directive to "*get out* of [her] house" implies that Deputy Martinez was already inside, further undercutting the conclusion that she refused to give consent before he entered the garage. (Italics added.)

In short, there was ample, and certainly substantial, evidence to support the conclusion that Arlov's statement occurred after Deputy Martinez entered the garage with Igor B.'s consent and therefore did not obviate that consent. As a result, Arlov fails to demonstrate that the trial court erred by denying the motion to suppress.

B.     *Substantial Evidence Supports the Perjury Conviction that Was Based on the 2014 CalFresh Application.*

Arlov also claims that the perjury conviction based on the original CalFresh application must be reversed because there was insufficient evidence that she made a false, material statement. To evaluate this claim, " 'we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every

11

fact the jury could reasonably have deduced from the evidence.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

Under section 118, subdivision (a), a person who makes a statement under penalty of perjury "and willfully states as true any material matter which [the person] knows to be false . . . is guilty of perjury." To support a perjury conviction, the statement must be "actually false." (*People v. Curl* (2009) 46 Cal.4th 339, 354.) In addition, the statement must involve a material matter, meaning that the statement " ' "might have been used to affect [the proceeding in or for which it was made]" ' [citation] or ' . . . could probably have influenced the outcome of the proceeding[].' " (*People v. Feinberg* (1997) 51 Cal.App.4th 1566, 1575.)

In framing her claim, Arlov focuses on the information's allegations that she lied by stating on the application "that no one, including herself, [whom she] buys or prepares food for has an income from a job and/or that no one, including herself, [whom she] buys or prepares food for has any resources and/or that she paid $350 in rent monthly." But the perjury charge was submitted to the jury on a narrower theory, that Arlov lied by stating she had no income. Specifically, the jury was instructed that "[t]he People allege that the defendant made the following false statement, that she had no income. You may not find the defendant guilty unless all of you agree the People have proved that the defendant made at least one false statement and you all agree on which particular false statement the defendant made." Likewise, in closing the prosecutor argued that the "the false information that was material was the lack of reporting the income." As a result, we conclude it is appropriate to limit our review to whether there is sufficient evidence to support the perjury conviction based on the theory that Arlov lied by reporting she had no income. (See *People v. Brown* (2017) 11 Cal.App.5th

12

332, 341 [prosecution's election of act to prove charge affects scope of substantial-evidence review].)

Arlov interprets the information to allege she lied only about "the income of hypothetical co-occupants she prepared food with and whether she paid a monthly housing expense of $350," *not* about her own income. Although the perjury charge was not well-worded, as suggested by the brackets we added in quoting it above, we disagree that the charge did not encompass Arlov's statements about her own finances. The information's actual wording, "that no one, including herself, buys or prepares food for has an income from a job," is more reasonably interpreted to include statements Arlov made about "herself," not just others. In any case, she never objected to the jury instruction or the prosecutor's argument permitting her to be convicted based on statements about her own income. She cites no authority to suggest that we are nonetheless barred from considering whether evidence of such statements supports the conviction.

We therefore turn to whether there was substantial evidence that Arlov made a materially false statement about her own income on the application. Arlov checked "No" in response to two questions: (1) "Does anyone you buy and prepare food with get income that does not come from work (unearned)?"; and (2) "Does anyone you buy and prepare food with have income from a job (earned income)?"[5] Arlov interprets the phrase "anyone you buy and prepare food with" in these questions to refer only to other people, not herself. Thus, she reasons, even if she had income, she did not lie by checking "No" because there were no other household members who could have had income.

---

[5] Arlov also left blank a space in which to list the gross monthly income of "[s]elf-employed household members."

13

Although this interpretation of the questions is reasonable in a vacuum, when they are read in the context of the application as a whole it is clear they refer to an applicant's own income as well. An initial question about the household's information directed the applicant to "[c]omplete the following information for all persons in the home that you buy and prepare food with, *including you*." (Italics added.) Moreover, no other portion of the application asked for an applicant's own income. Thus, if Arlov's interpretation were correct, an applicant could have millions of dollars in income and still accurately check "No" so long as the applicant lived alone or with others who had none of their own income. The jury could have reasonably determined that, assuming Arlov did have income, she had no rational basis for believing she answered the questions truthfully by checking "No." We conclude there was substantial evidence that she did, in fact, state that she had no income.

Arlov does not contest that if she falsely stated she had no income, the statement was material. Nor could she, as a Department eligibility worker testified that income "determines" one's eligibility for CalFresh benefits. Rather, Arlov's only other suggestion for why the evidence of perjury based on her income-related statements is lacking is because "the record does not clearly indicate what [her] income or expenses actually were in 2014." Although there was no evidence that Arlov was formally employed during the time period at issue, there was plenty of evidence that she had unearned income she failed to disclose. Not only was she admittedly receiving disability benefits, but in the months leading up to the application, thousands of dollars were deposited into the trust and business accounts she controlled. In turn, those accounts were used to pay for goods and services that the jury

14

could reasonably infer were Arlov's personal expenses, despite her testimony to the contrary.

In short, there was substantial evidence that Arlov made a false material statement on the CalFresh application by reporting that she did not have income. As a result, her challenge to the perjury conviction fails.

### III.
### DISPOSITION

The judgment is affirmed.

                               _____

                               Humes, P.J.

WE CONCUR:

_____

Margulies, J.

_____

Devine, J. *

*Judge of the Superior Court of the County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*People v. Arlov*  A163674