# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
April 14, 2009 Session

## STATE OF TENNESSEE v. ALFRED TURNER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-02872     W. Otis Higgs, Judge**

---

**No. W2007-00891-CCA-R3-CD   -   Filed June 22, 2010**

---

The defendant, Alfred Turner, was found guilty by a jury of the lesser included offenses of facilitation of felony murder, a Class A felony, and facilitation of second degree murder. After merging the convictions, the trial court sentenced the defendant to twenty-five years of incarceration as a Range I, standard offender.  On appeal, he argues that:  insufficient evidence exists to support his conviction; a proper chain of custody for the introduction of DNA evidence was not established; the trial court erred in allowing into evidence that two other individuals had been acquitted of this murder; and the trial court erred in both jury instructions and sentencing.  After careful review, we conclude that even though sufficient evidence existed to support the defendant's convictions, the defendant's sentence ran afoul of *Blakely* and the prior acquittals of two other individuals deprived the defendant of a fair trial.  Therefore, the error requires a remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which J.C. MCLIN, J., joined.  CAMILLE R. MCMULLEN, J., filled a dissenting opinion.

Lance Chism (on appeal), and Gerald Skahan and Juni Ganguli (at trial), Memphis, Tennessee, for the appellant, Alfred Turner.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Thomas D. Henderson and Reginald Henderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

At trial, Memphis police officer John Ingram testified that he responded to a dispatch call of a disturbance at 1649 Central Avenue. When he entered the home, the officer observed signs of a disturbance, including a broken dishwasher door, an overturned stool, a cut phone cord, and blood on the floor. He saw the victim, Emily Klyce Fisher, who had several gashes, stab wounds, and cuts in her back and the back of her head. He decided there was nothing he could do for the victim and continued walking through the house. He found the master bedroom "ransacked."

The medical examiner for Shelby County at the time of the victim's murder testified that he performed an autopsy of the victim. He testified that the victim suffered "multiple dozens of stab wounds, including a concentration to the right side of the head, multiple to the back, some to the chest, some to the arms, and some to the hands and other extremities."

Paulette Sutton, the supervisor of the Forensic Serology Lab at the University of Tennessee, was asked by the Memphis Police Department to conduct testing on samples of evidence taken from the crime scene. Her prior testimony was entered by stipulation of the parties. In her review of the crime scene, she observed a single blood stain on the threshold of the back door and "many, many blood stains" on the kitchen floor and in the breakfast room. Her testimony revealed that the blood stains and large pool of blood, along with brain tissue, in the dining room were consistent with that of a victim being stabbed on the floor. There was a bloody shoe print in the master bedroom and two distinct drops of blood on the floor near the bed. She collected cuttings from the bedroom carpet and the screen on the back door, as well as blood samples from the front stairway wall, the kitchen door, and the metal scroll work on the back door. She was later asked to examine a jacket in connection with this case and discovered a stain that tested positive for blood. All the samples were sent to the FBI laboratory for analysis.

Memphis Police Sergeant Richard Roleson testified that he was the case coordinator in the investigation of the victim's murder. He picked up the blood samples prepared by Sutton and delivered them to the FBI. He received information from a confidential informant that Rodney Blades was involved in the murder. He obtained Blades' fingerprints and submitted them for comparison to prints that had been lifted from the victim's car. He received a report that one fingerprint from the car matched Blades' print. He also developed George Tate as a suspect. The jacket examined by Sutton belonged to Tate. Both men were arrested.

Rodney Blades testified that he was a drug user living in Memphis in 1995. In February of that year, he was approached by two men who asked him to get marijuana for

them. He noticed that the men were in a car that did not belong in the neighborhood. When he asked if the car was stolen, he was told that it was. He got in the car and took several items from it. Two days later, he was arrested and charged with the murder of the victim. He was later acquitted.

George Tate also testified that he was arrested for the victim's murder. He knew the victim's son but told police he had never been to the victim's home. At a preliminary hearing, the victim's family maid identified that Tate was one of the men who attacked both her and the victim. After a trial, he was also acquitted.

Charles Shettlesworth, an investigator in the District Attorney's office, testified that he was asked to review the victim's file following the trials of Blades and Tate. He testified that there was an unidentified DNA profile left at the crime scene and that he sought to match that DNA. He investigated the case for the next six years until he received an anonymous tip following a story about the unsolved crime on a local television station. The informant, Sandra Cochran, provided the names of the defendant and Aaron Williams. Shettlesworth said that the police had an outstanding warrant for Williams for an armed robbery. As a result, he was arrested and brought in for questioning. Williams gave a lengthy statement implicating himself and the defendant in the murder. Based on this information, Shettlesworth obtained a warrant to draw blood from the defendant for a DNA comparison with blood found at the crime scene.

Cochran testified that she knew Aaron Williams and the defendant and that she had seen the victim's son in their apartment complex. Aaron Williams was her next-door neighbor, and she identified the defendant as the person who lived above her in 1995. She acknowledged that she provided information to law enforcement about the victim's murder and that she was paid approximately twenty-six thousand dollars for the information.

A special agent forensic scientist for the TBI testified that she performed the DNA analysis on the defendant's blood. She generated a DNA profile from the blood stains in the carpet and the back door screen cuttings taken at the crime scene by Paulette Sutton. When compared, the two DNA profiles showed a match to the defendant.

Aaron Williams testified that he was a close friend of the victim's son and that he was a neighbor to the defendant and Sandra Cochran. He testified that on the day of the murder, three men came to his apartment looking for the victim's son. The men told him that the victim's son owed them money. One of the men pulled up his sweater to show him that he had a pistol, and Williams told the men that he did not know where the son was. He then decided to go to the victim's house to warn them about the men. Because he did not have

a car, he went to the defendant's apartment to get a ride. Someone picked them up and then dropped them off near the victim's home.

Williams testified that he did not know the defendant was going to accompany him to the victim's house. Williams exited the car, crossed the street, and then saw the defendant running behind him. He had notified the victim's family on another occasion when their son was in trouble because he owed people money. Williams and the defendant went to the side door, and the victim answered the door. She let them enter the house, and they exchanged greetings before he asked if the son was in town. The victim told them he was not in town and left the kitchen to phone her son. He waited in the kitchen with the maid but overheard the victim screaming at her son on the phone.

Williams testified that he heard a commotion and the victim asking, "[W]hy you doing this to me?" He went to see what was going on and saw the defendant stabbing the victim. The defendant was kneeling over the victim and stabbing her "constantly." The victim was trying to defend herself and was screaming. The maid ran over and began to hit the defendant with a wooden spoon. The defendant commanded Williams to grab the maid, and he pulled her outside of the house. He ran to the end of the driveway before returning to the house. He reentered the house and heard the defendant asking where the money was located. Williams thought the victim's son owed the defendant twenty dollars. He saw the victim, on the floor, making "sounds like fighting for your life."

Williams decided to flee after he went upstairs and saw that the defendant had bound the maid with a phone cord. He ran down the stairs and took the keys to the victim's car. Initially, he did not know which keys he took, but pressed the alarm button on the remote so he could take that car. As he was adjusting the seat to get into the car, the defendant came outside and jumped in the car. Williams recalled that they yelled at each other. The defendant told him that, if he did not get his money, he was going to do the same thing to the victim's son. The defendant cut his hand during the murder and bled in the car. Shortly after Williams stopped the car, he was approached by Rodney Blades, who asked about the victim's son and the car.

Williams later told Sandra Cochran that the defendant robbed the victim. He acknowledged that he lied to police when he was questioned about the murder. He told the victim's son that the defendant killed the victim. The victim's son told him to "keep his mouth shut" about what had happened, and Williams followed that advice. He later agreed to testify against the defendant in exchange for a reduced sentence.

Daniel Holloman testified that he lived next door to the victim at the time of her murder. He said that he looked out his window on the morning of her murder and saw three

young, African-American men standing at the back door of the house. He said they were all short and wore baggy clothes.

Peggy Hill's prior testimony was read to the court. She testified that she lived in an apartment near the victim's house. She said that the victim's maid came to her home at approximately 11:00 a.m. on the morning of the murder. She went to the victim's house and found the victim lying on the dining room floor with "many stab wounds." She rendered first aid until the paramedics and police arrived. The maid told her that "three boys had come into the house."

The prior testimony of the victim's son was also read to the jury. He testified that he developed a serious substance abuse problem during his senior year of high school. He frequently stole money and property from his family to buy drugs. He knew Tate from using cocaine and said Tate had been in the victim's home and knew the family was wealthy.

Lieutenant Dennis Benjamin testified that he was a member of the Violent Crime Task Force in Memphis in 1995. He was one of the officers that arrested Rodney Blades for the victim's murder. Benjamin removed several items from the Blades' residence and discovered a receipt and paperwork in the garbage can outside the residence with either the victim's or her husband's name on them.

Lieutenant Jerry Gwyn testified he heard Blades say "there's so many of you [officers,] it must be about a killing."

Keith Summerville was called to testify by the defendant, but he asserted his Fifth Amendment privilege. The trial court ruled that he did not have "a blanket privilege against self-incrimination, based on something he said ten years ago" and ordered Summerville to "give testimony in this trial." Summerville again refused to testify and was held in contempt of court. A recess was held, and Summerville then testified that he was locked up with Rodney Blades in a holding cell on March 1, 1995. He said Blades told him he broke into a house, stabbed a white woman, and tied up a black woman. Summerville testified against Blades at his trial.

Dr. O. C. Smith testified as an expert in clinical pathology. He discussed various categories of laboratory error and the concept of chain of custody of evidence. He also testified about specific problems regarding DNA testing. On cross-examination, he admitted that he had never actually conducted a DNA analysis.

Officer E. R. McCommon's prior testimony was read to the jury. He testified that on March 1, 1995, he showed the victim's maid photographs of six men in a photo array. She

identified Rodney Blades as one of the men who attacked her and the victim. She later identified George Tate as the other assailant.

The prior testimony of the victim's husband was read to the jury. He testified that the victim was his wife and that, at the time of her death, she owned a green Taurus station wagon. He also testified that their son was a drug addict who stole from the family to purchase drugs. He knew George Tate as a friend of his son who had been to their home.

Officer John Botting's prior testimony was read to the jury. He testified that he assisted in taking a statement from the maid after she identified Blades and Tate by photograph. She described how each man attacked her and the victim. The videotaped statement was played for the jury.

A clinical psychologist testified that he had evaluated the maid at the request of the State in September 1995. He opined that she was not competent to testify because she showed significant deterioration of short term memory. He further testified that he was surprised to learn the State used her videotaped statement at the trial of Blades and Tate because he did not think she was credible or competent when she made that statement.

Following the trial, the defendant was convicted of facilitation of felony murder and facilitation of second degree murder. The trial court merged his convictions and sentenced him to twenty-five years as a Range I, standard offender.

Analysis

On appeal, the defendant contends that insufficient evidence was presented for the jury to convict him of facilitation to commit second degree murder and facilitation to commit first degree felony murder as lesser included offenses of the indicted offenses of first degree (premeditated) murder and felony murder committed during the commission of a theft. When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Brewer*, 932 S.W.2d 1, 18 (Tenn. Crim. App. 1996).

In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary,

this court is required to afford the State the strongest legitimate view of the evidence contained in the record, as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003).

The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence. *Id.* In *State v. Grace*, the Tennessee Supreme Court stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." 493 S.W.2d 474, 476 (Tenn. 1973).

After viewing the evidence in the light most favorable to the State, the essential elements of facilitation to commit second degree murder and facilitation to commit first degree felony murder could have been found by a rational trier of fact based on the evidence in the record. At the time of the offenses, felony murder was defined as "a reckless killing of another committed in the perpetration of or attempt to perpetrate any . . . theft. . . ." T.C.A. § 39-13-202(a)(2) (1994). A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent. T.C.A. § 39-14-103 (1994). Second degree murder was defined as the knowing killing of another. T.C.A. § 39-13-210(a)(1) (1994). Facilitation is established by proof that the accused knew another person intended to commit a specific felony and knowingly furnished substantial assistance in the commission of the felony. T.C.A. § 39-11-403(a).

Here, the defendant contends that, because the State's theory was that the defendant committed the crime alone, no reasonable juror could have concluded that the defendant knew that another person was going to commit the crime and that the defendant knowingly lent substantial assistance to this other person. The jury verdict was inconsistent with the State's theory of the case; however, this court must decide whether the proof, viewed in the light most favorable to the State, established the essential elements of the convicted offenses. Here, the State presented both an eyewitness and DNA evidence that demonstrated the defendant was inside the victim's home when she was murdered. The eyewitness testified that the defendant demanded money as he stabbed the victim "continuously." The eyewitness also testified that he and the defendant escaped from the crime scene by taking the victim's car. While they were fleeing the scene, the eyewitness observed that the defendant's hand was bleeding.

This court was presented with a similar situation in *State v. Davis*, 751 S.W.2d 167 (Tenn. Crim. App. 1988), where a conviction of a lesser offense was affirmed. In *Davis*, the defendant was indicted for first degree murder, and the jury found the defendant guilty of

voluntary manslaughter. On appeal, Davis argued that the record was devoid of any evidence showing provocation. This court agreed that there was no evidence that the crime was committed in "a sudden heat" but rejected the defendant's claim for an acquittal. The holding in *Davis* relied upon the Tennessee Supreme Court decision in *State v. Mellons*, 557 S.W.2d 497 (Tenn. 1977), wherein the court ruled that the giving of an instruction on a lesser included offense unsupported by the evidence did not necessarily result in reversible error:

> On appeal, a conviction of a lesser degree of the crime charged, or of a lesser included offense, will be upheld, even if there is no evidence in the record to establish the technical elements of that crime, if the evidence demands a conviction of a higher degree of homicide than that found by the verdict, and there is either no evidence in support of acquittal of the greater crime, or if there is, the verdict of the jury clearly indicates that the evidence in support of acquittal was disbelieved, on the theory that the defendant was not prejudiced by the charge and the resulting verdict.

*Id.* at 499. Here, the evidence could have supported a conviction for either first degree (premeditated) murder or first degree (felony) murder. Accordingly, under the holdings in *Davis* and *Mellons*, the conviction for facilitation of felony murder should be affirmed. *See State v. Jeffery Lee Mason*, No. M2002-01709-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 447, at **16-18 (Tenn. Crim. App. at Nashville, May 19, 2004).

Next, the defendant argues that the trial court erred in allowing the State to introduce the DNA analysis of the defendant's blood and the samples taken from the crime scene into evidence because the State had not clearly established a chain of custody for the blood evidence. Specifically, the defendant contends that this court should exercise plain error review because he failed to timely object to the introduction of the evidence at trial and did not include the issue in his motion for new trial. The defendant did object to the evidence at trial but did not make a timely objection.

Here, the defendant requests that this court review the issue under plain error. An error which has affected the substantial right of a defendant may be noticed at any time in the discretion of the appellate court, where necessary to do substantial justice. *State v. Taylor*, 992 S.W.2d 941, 944 (Tenn. 1999). "Plain error" or "fundamental error" is recognized under Rule 52(b) of the Tennessee Rules of Criminal Procedure. *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). Some errors are so fundamental and pervasive that they require reversal without regard to the facts or circumstances of the particular case. *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S. Ct. 1431, 1436 (1986).

There are five factors which must be present for a court to determine that "plain error" exists:

   (a)  the record must clearly establish what occurred in the trial court;
   (b)  a clear and unequivocal rule of law must have been breached;
   (c)  a substantial right of the accused must have been adversely affected;
   (d)  the accused did not waive the issue for tactical reasons; and
   (e)  consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (citing *Adkisson*, 899 S.W.2d at 641-42). Complete consideration of all five factors is unnecessary if at least one is absent. *Id*. at 283. Furthermore, the plain error must be such that it probably changed the outcome of the trial. *Adkisson*, 899 S.W.2d at 642.

Pursuant to Rule 901(a) of the Tennessee Rules of Evidence, it is "well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody." *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000) (quoting *State v. Holbrooks*, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998); Tenn. R. Evid. 901). The purpose of the chain of custody requirement is "to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993). "Whether the required chain of custody has been sufficiently established to justify the admission of evidence is a matter committed to the sound discretion of the trial court, and the court's determination will not be overturned in the absence of a clearly mistaken exercise of that discretion." *State v. Holloman*, 835 S.W.2d 42, 46 (Tenn. Crim. App. 1992).

It is enough if the circumstances demonstrate, with reasonable assurance, that the evidence is the same evidence seized. *State v. Woods*, 806 S.W.2d 205, 212 (Tenn. Crim. App. 1990). The evidence may be admitted when the circumstances surrounding the evidence reasonably establish the identity of the evidence and its integrity. *Holloman*, 835 S.W.2d at 46. Moreover, the failure to call all of the witnesses who handled the evidence does not necessarily preclude its admission into evidence. *See State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984).

Mr. Shettlesworth testified that he obtained a search warrant to draw the defendant's blood for a comparison to blood found at the crime scene. A nurse from the Memphis Sexual Resource Agency (MSRAC) drew the blood in Shettlesworth's presence. She then sealed the container and took it with her on a Friday. The following Monday, Shettlesworth picked up the sealed container of blood from the nurse at MSRAC and delivered it to the TBI laboratory. He also testified that he retrieved the crime scene evidence from the FBI lab

when he began investigating the case. A receipt for property was introduced at trial, listing various items of evidence, including the cuttings from the bedroom carpet and back door screen that were delivered to Shettlesworth by an FBI Agent. Shettlesworth turned the items over to the TBI laboratory on the same day.

The TBI forensic scientist who performed the DNA analysis testified that she received the defendant's blood sample from Shettlesworth on February 2, 2004. She also acknowledged receipt of the "initial samples" from Shettlesworth on July 6, 2000.

The evidence presented at trial demonstrates a proper chain of custody for the defendant's blood and the items taken from the crime scene. The defendant specifically contends that it should be considered a broken chain of custody because Mr. Shettlesworth did not know the exact location of the blood sample at all times. However, the trial court determined that the blood was in the possession of the Memphis Sexual Resource Agency between the time it was drawn, in Mr. Shettlesworth's presence, and the time it was picked up by him for testing. With regard to the crime scene samples, the defendant argues that the State did not establish what happened to the samples while they were in FBI custody. The State does not have a burden to exclude all possibility of tampering. It is reasonable assurance, not absolute assurance, of the identity and integrity of the evidence that is required of the State. *Woods*, 806 S.W.2d at 212. The proof at trial reasonably established the identity and integrity of the blood evidence, and the defendant is not entitled to relief on this issue.

Next, the defendant argues that the trial court erred in allowing the State to reference the acquittals of Rodney Blades and George Tate following their trial for the murder of the victim. Specifically, the defendant argues that by informing the jury that a previous jury had acquitted Mr. Blades and Mr. Tate, the jury was not given an opportunity to independently decide whether the two men were responsible for the victim's murder. The defendant contends that the previous jury verdict would likely weigh heavily in the minds of the present jury and that any probative value of the evidence of the acquittals was substantially outweighed by the danger of unfair prejudice.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Once the court concludes the evidence is relevant, the court should exclude the evidence if its probative value is substantially outweighed by its prejudicial effect. Tenn. R. Evid. 403; *State v. James*, 81 S.W.3d 751, 757 (Tenn. 2002). A trial court's decision as to the relevance of evidence under Rule 401 will be reversed only upon a showing of abuse of discretion. *State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003). Tennessee Rule of Evidence 402 states that "all relevant evidence is

admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible." This court has previously stated that "the trial court is entitled to draw upon common sense, general knowledge, and its understanding of human conduct and motivation in assessing whether evidence could reasonably affect an assessment of the probability of the fact to be inferred." *State v. Hayes*, 899 S.W.2d 175, 183 (Tenn. Crim. App. 1995).

That relevant evidence is prejudicial does not mean the evidence must be automatically excluded. "Any evidence which tends to establish the guilt of an accused is highly prejudicial to the accused, but this does not mean that the evidence is inadmissible as a matter of law." *State v. Dulsworth*, 781 S.W.2d 277, 287 (Tenn. Crim. App. 1989); *State v. Gentry*, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993).

Here, the defendant's theory of defense was that Mr. Blades and Mr. Tate actually committed the murder. The defendant used the testimony of witnesses from their trial to establish his defense, but he sought to prevent the State from telling the jury that the two had been acquitted at trial. The trial court denied the defendant's motion in limine regarding the issue. The basis of the defendant's argument on appeal is that he was denied a fair trial because he contended that Mr. Blades and Mr. Tate were responsible for the victim's murder, the jury was allowed to hear that they had been acquitted following their own trial.

The general rule is that the admission of evidence of a judgment of acquittal is inadmissible as being irrelevant. Evidence of a prior acquittal is not relevant because it does not prove innocence but, rather, indicates that the prior prosecution failed to meet its burden of proving beyond a reasonable doubt at least one element of the crime. *See United States v. Kerley*, 643 F.2d 299, 300-01 (5th Cir. 1981); *United States v. Lonnie Paul*, No. 05-12430, 2006 U.S. App. LEXIS 22734, at **7-8 (11th Cir., Sept. 7, 2006). Even if a court were to find the information of the acquittal relevant, the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and the possibility of misleading the jury. *Kerley*, 643 F.2d at 301. The trial court should not have allowed the evidence of the prior acquittals. The inclusion of this information was likely to have affected the result of the trial; therefore, we are compelled to remand the case to the trial court for a new trial.

Next, the defendant contends that the trial court erred in failing to charge recklessness as an element of felony murder in the jury instructions for that offense. The defendant, who did not object at the time the instructions were given and did not raise the issue in his motion for new trial, asks this court to review the issue under the plain error doctrine.

The murder was committed on February 27, 1995. At that time, felony murder was defined as the unlawful, "reckless killing of another committed in the perpetration of, or attempt to perpetrate any . . . theft. . . ." T.C.A. § 39-13-202(a)(2) (1994). The trial court omitted the reckless element for felony murder in the jury instruction and, instead, charged the jury that felony murder was an unlawful killing during the commission of a felony.

In a criminal case, a defendant has a right to a correct and complete charge of the law. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). The material elements of the charged offense should be described and defined in connection with that offense. *State v. Ducker*, 27 S.W.3d 889, 899 (Tenn. 2000); *State v. Cravens*, 764 S.W.2d 754, 756 (Tenn. 1989). "The misstatement of an element in jury instructions is subject to constitutional harmless error analysis." *State v. Faulkner*, 154 S.W.3d 48, 60 (Tenn. 2005) (citing *Pope v. Illinois*, 481 U.S. 497, 501-03 (1987)). Likewise, "[t]he failure to instruct the jury on a material element of an offense is a constitutional error subject to harmless error analysis." *Id.* The failure to do so deprives the defendant of the constitutional right to a jury trial and subjects the erroneous jury instruction to harmless error analysis. *Garrison*, 40 S.W.3d at 433-34 (holding error harmless when omitted element "was not contested at trial and essentially has been conceded").

Here, the trial court's omission of the reckless element in the jury instructions was error. However, we conclude that it was harmless error. In *State v. Page*, 81 S.W.3d 781, 789 (Tenn. Crim. App. 2002), this court examined the harmful effect of the trial court's erroneous definition of "knowingly" in the jury instruction for second degree murder. The court recognized that "in many, if not most, homicide trials the *mens rea* jury instruction utilized in this case would be harmless error." *Id.* at 789. This statement came from this court's observation that causation and identity of the defendant are often the theory of the defense. *Id.* For example, in *Page,* this court discussed a situation where a sleeping victim is shot at point blank range, and the defense is that the defendant was not the shooter. In that case, because *mens rea* is not a disputed issue at trial, an erroneous instruction would likely be harmless. Here, the defendant's *mens rea* was not an issue. The defendant exclusively challenged the charges on the grounds that someone else committed the murder. The defense was essentially a denial of the accused facts. Because the jury convicted the defendant of facilitation of felony murder, it is unlikely that the jury's verdict would have been different if the trial court had properly instructed the jury that felony murder required a reckless killing rather than an unlawful killing.

Next, the defendant contends that his sentence was improperly enhanced using facts not found by the jury in violation of *Blakely v. Washington*, 542 U.S. 296 (2004), and that the trial court erred in computing the sentence imposed by beginning at the mid-point in the

range. The State concedes that the trial court erred in both respects and agrees that review of the sentencing issues is necessary for justice.

The defendant was convicted of facilitation of felony murder, a Class A felony, *see* T.C.A. §§ 39-11-117 and -403(b), and was sentenced as a Range I offender. *See* T.C.A. § 40-35-105. A Range I offender convicted of a Class A felony is subject to a potential sentence of fifteen to twenty-five years. *See* T.C.A. § 40-35-112(a)(1). Under the law in effect at the time this offense was committed, the presumptive sentence for a Class A felony was the minimum in the range. *See* T.C.A. § 40-35-210(c) (1990). The sentence could be enhanced or reduced based upon the existence of applicable enhancement and mitigating factors. *See* T.C.A. § 40-35-210(d), (e). In *Blakely*, the Supreme Court held that the relevant "statutory maximum" for sentencing purposes "is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303. Except for a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Cunningham v. California*, 549 U.S. 270, 282 (2007). The Tennessee Supreme Court has concluded that other than a defendant's previous history of criminal convictions or criminal behavior admitted to by the defendant, the application of enhancement factors that increases the defendant's sentence over the statutorily presumptive sentence deprives the defendant of his Sixth Amendment right to have a jury determine whether those enhancement factors applied. *State v. Gomez*, 239 S.W.3d 733, 739-40 (Tenn. 2007).

Here, the trial court applied five enhancement factors to impose the sentence of twenty-five years: (1) the defendant was a leader in the commission of the offense, and it involved two or more persons; (2) the defendant treated or allowed a victim to be treated with exceptional cruelty; (3) the defendant possessed a weapon, a deadly weapon; (4) the defendant had no hesitation about committing the crime; and (5) the crime was committed under circumstances [under] which the potential for bodily injury was great. The trial court specifically noted that the defendant had no prior criminal record.

Initially, the State agreed with the defendant that the trial court erred by applying the sentencing law in effect at the time of the sentencing and taking a position that the presumptive sentence should be twenty years, midrange. At the time of the murder, the presumptive sentence was fifteen years, the minimum in the range. Because application of the incorrect sentencing law implicates *ex post facto* constitutional provisions, the trial court was required to apply the law in effect on the date the offense was committed. *State v. Blackmon*, 78 S.W.3d 322 (Tenn. Crim. App. 2001).

Here, the defendant's only prior criminal convictions were a minor traffic offense and a weapons charge for which he received diversion. Because the application of enhancement factors violated *Blakely, Cunningham, and Gomez II*, we conclude that he was improperly sentenced. The defendant's sentence should have been set at fifteen years.

Conclusion

Based on the foregoing and the record as a whole, we conclude that the evidence was sufficient to support the defendant's convictions. However, the trial court improperly allowed evidence of the acquittal of two other men and improperly sentenced the defendant in violation of *Blakely*. Therefore, we remand for a new trial.

_____
JOHN EVERETT WILLIAMS, JUDGE